[No. 450-2.  Division Two.  April 6, 1972.]

THE STATE OF WASHINGTON, *Respondent*, v. ALFONSO MARTIN JEFFERSON, *Appellant*.

*Hugh E. Fountain, Jr.*, for appellant (appointed counsel for appeal).

*Ronald L. Hendry, Prosecuting Attorney, Eugene G. Olson, Chief Criminal Deputy*, and *Joseph D. Mladinov, Special Counsel*, for respondent.

ARMSTRONG, J.—Defendant, Alfonso Jefferson appeals from a jury conviction of robbery and two counts of assault.

His appeal from the judgment and sentence raises three questions. (1) Was the state erroneously permitted to impeach its own witness (Carrie Holland)? She was initially called by the defendant in support of his alibi. Later, on the state's rebuttal, she was further cross-examined by the state to perfect the foundation for impeaching contradictory statements she made to two police detectives. (2) Was it a violation of the hearsay rule to permit impeaching testimony of the two police detectives, which included incriminating statements of the defendant? (3) Was it error for the court to fail to give a limiting instruction on the consideration to be given the impeaching statements when no such instruction was requested by defendant?

Considering first the background facts, we find that on the evening of December 9, 1970, at about 8 p.m., Jack Eyrish drove into the parking lot of the Empress Gardens in Tacoma. When he left his vehicle he was accosted by three men wearing coats and masks. Two of the men were holding pistols. He refused a request to go into the alley. He threw his wallet at them and was slugged. He then proceeded into the restaurant despite threats that he would be shot if he did not go into the alley.

A witness in the restaurant saw an automobile leave the parking area in a hurry. He identified it as a white 1962 or 1963 Chevrolet.

Between 8 and 8:15 p.m. police officers Arthur James Hargrove and Paul A. Swortz learned of the alleged robbery and the description of the car. Shortly thereafter they located a 1964 light colored Chevrolet with two men in the front seat. Testimony of an accomplice revealed that a third man was lying on the floor of the back seat.

When the police flashed a light on the suspect car it stopped and the passenger in the Chevrolet got out. Officer Hargrove started to get out of the police vehicle when he saw a muzzle flash, heard two shots and realized he had

been hit. He got back in the patrol car and called for assistance.

The driver, Officer Swortz, fired two shots as he was getting out of the vehicle and two more after he got behind the cover of the car. The assailant fired six shots at the officers, which lodged in the patrol car. Four of them pierced the windshield of the patrol car. The assailant ran, Officer Swortz chased him down an alley and fired two more shots. The Chevrolet left the scene when the shooting began.

James E. Bibbs testified as an accomplice in the crime. He said that he and the defendant had been friends for many months. Their friendship, including visits in each other's homes was verified by several witnesses. He described how he, the defendant and Bibbs' brother-in-law made masks from Bibbs' tee shirts on the afternoon preceding the crime. The baby-sitter in the Bibbs' home verified that Jefferson was a frequent visitor and she witnessed the making of the masks.

Bibbs stated that Jefferson was the one who threatened the victims and shot at the police officers. After Bibbs drove off he abandoned the car and went home.

With this background information we next consider the major issue—was it error to impeach Carrie Holland by the testimony of two police officers who interviewed her in investigating the crime and who elicited statements from her allegedly made by the defendant? To answer this question we must consider the procedure that developed in the course of the trial.

Carrie Holland was on the state's witness list. There is nothing unusual about this because it is customary for the state to list every witness who has information about the crime and who may be called by the state.

Mrs. Holland was first called to testify on behalf of the defendant Jefferson. Mrs. Holland knew Jefferson because he had visited her son the prior summer. On direct examination she stated that he arrived at around 8 o'clock. She placed the time because her children sit down to watch

television at 8:30 p.m. He stayed until about 10 o'clock and left in a taxi.

On cross-examination she was asked if she remembered giving the police a statement. She did remember and stated that it was the truth. She denied hearing any shooting but admitted that she had heard something about a shooting. She could not recall that the defendant, on arrival, said there had been a shooting. After questioning she admitted that it could have been between 8 and 8:30 p.m. that defendant arrived at her house.

In analyzing all of the testimony of Mrs. Holland on cross-examination it becomes evident she wanted nothing to do with the case. She was evasive and clearly a hostile witness. Her testimony concluded with the following questions and answers:

> MR. FLEMING: Mrs. Holland, did not the defendant when he came to your house say that he ran into your house because he was scared because he heard shooting, so he ran into your house, didn't he tell you that?
> THE WITNESS: He didn't tell it to me.
> MR. FLEMING: Did you hear him say it?
> THE WITNESS: I didn't tell you that.
> MR. FLEMING: Did you hear him say it?
> THE WITNESS: I didn't tell you that.

In rebuttal the state called Detective Ralph Colyer who testified that he had interviewed Mrs. Holland on December 30, 1970. On the basis of hearsay, defense counsel objected to the witness relating the statements made by Mrs. Holland which were attributed to Jefferson. The court recognized that the problem was one of whether Mrs. Holland could be impeached by showing statements made to two police detectives, which were inconsistent with her prior testimony. The court reasoned that a proper foundation for impeachment had not been established, and advised the prosecutor that he could cross-examine Mrs. Holland to establish a basis for impeaching her testimony.

The testimony of Detective Colyer was then interrupted and Mrs. Holland was recalled to the stand by the state.

She admitted the interview but denied telling the detectives that when defendant came to the house he told her he had heard shooting, saw police cars and ran into her house.

Detective Colyer was then recalled to the witness stand to complete his testimony. He testified that when he interviewed Mrs. Holland on December 30, 1970 she said that when the defendant had come to her home, he told her that there was a shooting going on up the street and he had come in there.

Detective Colyer's testimony was corroborated by Detective Nelson, who had interviewed Mrs. Holland at the same time on December 30. He quoted Mrs. Holland as stating that when defendant came to the door, "He said that there was a whole bunch of shooting going on up the street, and I got scared and ran in here."

██ We shall first address ourselves to the defendant's contention that the state was permitted to impeach its own witness without a legitimate claim of surprise and prejudice. The answer to this contention is that Mrs. Holland was not the state's witness. She was called by the defendant to support his alibi. In cross-examination the state established that she had made a statement of a material fact which was inconsistent with a prior statement she had allegedly made to two police detectives, but the state had not laid a proper foundation. The court suggested, out of the presence of the jury, that Mrs. Holland be recalled to lay a foundation for impeaching testimony. It was within the court's discretion to make that suggestion and to permit the testimony of the state's rebuttal witness to be interrupted for further cross-examination of Mrs. Holland. This did not make Mrs. Holland the state's witness. She was at all times a witness for the defendant and not the state's witness. It was, therefore, not necessary to show surprise and prejudice.

██ It has been clearly established that a witness for the other party may be impeached by showing that he had made prior out-of-court statements of a material fact which are inconsistent with or contradictory to his testimony in

court. This jurisdiction follows the majority rule that before impeachment testimony may be presented there must be a proper foundation established. To establish a foundation for impeaching questions it is necessary to call the attention of the witness to the contradictory or inconsistent statements, the person to whom they were made, the time when and place where they were made and the circumstances surrounding their making. The witness should have an opportunity to admit, deny or explain them. *May v. Wright,* 62 Wn.2d 69, 381 P.2d 601 (1963). A proper foundation was established when the witness was recalled for further cross-examination.

Defendant's contention that the state erred in introducing hearsay evidence brings us to another facet of the rule permitting impeachment of a witness. The purpose of impeachment is to attack the credibility of the witness and not to furnish substantive evidence of the crime. The fact that the witness has stated the facts differently shows either a failure of memory, that he has forgotten what he once knew, or else it shows a want of integrity—either way it impairs the value of his testimony. The contradictory statements are admissible solely to impeach the witness and not as direct and affirmative proof of the facts to which they relate. *State v. Sandros,* 186 Wash. 438, 58 P.2d 362 (1936).

This brings us to the final contention of defendant that the court failed to give a limiting instruction which would point out to the jury that the testimony of the police detectives relative to Mrs. Holland's statements could be considered only as they may or may not relate to the integrity of the witness and could not be considered as proof of the fact that defendant made the statement.

█ The answer to the failure to give a limiting instruction is that defendant did not request such an instruction. No error attaches to failure to instruct if no request is made. *State v. Missmer,* 72 Wn.2d 1022, 435 P.2d 638 (1967); *State v. Brummett,* 98 Wash. 182, 167 P. 120 (1917).

684

Lest it appear that defendant was convicted solely upon the testimony of an accomplice and damaging testimony presented to impeach an alibi witness, we should point out that there was strong corroboration of the testimony of the accomplice from several witnesses. We see no point in detailing that testimony. We are convinced from a careful reading of the record that the evidence of guilt was substantial and the defendant had a fair trial.

Judgment affirmed.

PETRIE, C.J., and PEARSON, J., concur.

Petition for rehearing denied May 10, 1972.