[No. 13292–0–I.  Division One.  October 15, 1984.]

THE STATE OF WASHINGTON, *Respondent,* v. HARTE VALENTINO ELLAZAR BARBER, *Appellant.*

*Culp, Dwyer, Guterson & Grader, Murray B. Guterson, Edwards & Barbieri,* and *Malcolm L. Edwards,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Deanna J. Fuller, Deputy,* for respondent.

SCHOLFIELD, J.—Harte Valentino Ellazar (Val) Barber appeals his conviction for murder in the first degree after a jury trial, alleging the trial court violated his right of confrontation by admitting the out–of–court declarations of an unavailable codefendant and also erred by admitting impeachment testimony. We affirm.

Teodorico Dominguez (Boy Pilay) was shot and killed sometime between 7:30 p.m. on Saturday, January 15, 1983,

and 3:30 a.m. on Sunday, January 16, 1983. His body was found at a location approximately 20 minutes by car from the International District in Seattle. Val Barber and Esteban Hermosa (Steve) Ablang were charged with the murder. Ablang was never arrested; evidence indicated that he flew to the Philippine Islands shortly after the murder. His whereabouts at the time of trial were unknown. Barber was tried and found guilty by a jury.

Gayle Corbett testified for the prosecution. She testified to a close personal relationship with Ablang. She testified that Ablang came to her apartment at between 3 and 3:30 a.m. on Sunday, January 16. She had expected him earlier in the evening. He let himself in with his own key. Corbett was in bed and Ablang lay down on the bed beside her. At first there was some small talk and then Ablang asked her if she enjoyed his company and friendship. Corbett responded, "Yes. Why?" Ablang then said, "Because I might go to jail." Corbett asked why and Ablang said, "Because Val and I killed Boy." In response to queries by Corbett, Ablang repeated the statement twice. Also in response to her questions, Ablang said he and Barber had killed Boy Pilay because of Boy's part in the death of Jessie Barber, Val Barber's uncle.

Corbett testified that on Monday, the following day, Ablang called her at her place of employment and asked her to go to a travel agency and pick up his passport. She did this and gave it to him after work that day. Ablang slept at her apartment that night. Corbett did not work the next day, Tuesday, and between 11:30 a.m. and noon, Val Barber and his brother, Raul Barber, Jr., picked up Corbett and Ablang at her apartment and drove them to the Seattle–Tacoma airport, where Ablang boarded a plane for the Philippine Islands. Corbett testified that before leaving for the airport, she asked Ablang if Barber knew that she had been told about the murder. Ablang's reply was yes. Corbett testified that during the ride back to her apartment from the airport, Val Barber asked her, "Gayle, are you going to talk?", to which she replied, "Don't you trust

me?", and he responded, "I don't know."

On February 9, 1983, Corbett was questioned by a detective and gave a tape–recorded statement in which she failed to disclose Ablang's statements to her about the killing, her retrieval of his passport, and the trip to the airport. Corbett testified that she did this because she was fearful of "retribution" and did not want to get involved.

Paul Crayton also testified for the prosecution. He testified that he knew Barber because Barber was related to his wife by marriage. Crayton testified to a chance encounter with Barber, Ablang, and some of their friends at Longacres racetrack in the summer of 1982. They appeared to be somewhat intoxicated. Crayton stood near them and watched a race. During that time he heard Barber state that he was going to get Boyse (Campo) and Pilay and that he would like to blow their heads off. Crayton also recalled a later occasion where Barber expressed the view that Campo and Pilay were implicated in the murder of his uncle, Jessie Barber.

Raul Monillas also testified for the prosecution. He testified that he was in the 609 Club from approximately 9 p.m. until midnight on the night of the murder and that he did not see Boy Pilay in the club during that time. He also testified that at a party a year or so before the killing of Pilay, he overheard Barber seeking information from Campo about the identity of his uncle's killer. He overheard Barber offer money for the information. Monillas denied, however, telling Detective Richard Krogh that during the same conversation he heard Barber offer $3,000 for someone to kill his uncle's murderer. Monillas also testified that he had talked to Campo on Sunday, the day after the murder, but denied telling Campo there was a price on his head and Pilay's head. On cross examination, Monillas testified that he had seen Arturo Valera in the 609 Club on the night of the murder.

Detective Krogh testified for the State that during his interview with Monillas on January 28, 1983, Monillas had told him that approximately a year earlier he had over-

heard Barber not only ask for information about his uncle's murder, but also offer $3,000 to have his uncle's murderer killed. Barber did not object to Detective Krogh's testimony and did not request an instruction limiting the jury's use of Detective Krogh's testimony.

Arturo Valera testified for the State that he had been at the China Gate restaurant between 10 p.m. and midnight on the night of the murder and that he had not seen Barber there, thus contradicting Barber's alibi. Valera also testified that he saw Barber at the China Gate restaurant at 1 a.m. and that Barber did not respond when Valera asked him where he had been earlier in the evening.

### RIGHT OF CONFRONTATION

The trial court admitted Gayle Corbett's testimony that Steve Ablang told her that he and Val Barber had killed Boy Pilay to avenge the murder of Barber's uncle. The trial court ruled that Ablang's out–of–court statements were declarations against penal interest under the ER 804(b)(3) exception to the hearsay rule.[1]

Barber contends that the admission of Ablang's statements violated his right of confrontation under the United States and Washington Constitutions.[2] He contends that Ablang's statements were unreliable under the test set forth

---

[1]ER 804(b) provides, in part:

"The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

". . .

"(3) *Statement Against Interest.* A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."

[2]The sixth amendment to the United States Constitution provides, in part:

"In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . .".

Article 1, section 22 of the Washington Constitution provides, in part:

in *Ohio v. Roberts,* 448 U.S. 56, 65 L. Ed. 2d 597, 100 S. Ct. 2531 (1980) and *State v. Parris,* 98 Wn.2d 140, 654 P.2d 77 (1982).[3]

In *Ohio v. Roberts, supra,* the Court most recently considered the relationship between the confrontation clause and the hearsay rule with its many exceptions. At issue in *Roberts* was the admission at trial of the preliminary hearing testimony of a witness who was not available to testify. The Court found that the confrontation clause operates to restrict the range of admissible hearsay. *Roberts,* at 65. The Court set forth a 2–part test to determine whether hearsay that is otherwise admissible violates an accused's right of confrontation. Under this test, first, the witness must be unavailable to testify and, second, the hearsay evidence must be reliable. *Roberts,* at 65–66.

The reliability of hearsay evidence can be inferred if the hearsay falls within a "firmly rooted hearsay exception." If the hearsay does not fall within such an exception, however, it must possess "particularized guarantees of trustworthiness." *Roberts,* at 66.

In *State v. Parris, supra,* the court held that inculpatory declarations against interest either do not fall within a "'firmly rooted hearsay exception'" or, even if they do, "'particularized guarantees of trustworthiness'" are still required. *Parris,* at 148. The court held that inculpatory declarations against interest must be accompanied by "corroborating circumstances clearly indicating their trustworthiness". *Parris,* at 148. The court observed that the "'particularized guarantees of trustworthiness'" test and the "corroborating circumstances clearly indicating their trust-

---

"In criminal prosecutions the accused shall have the right . . . to meet the witnesses against him face to face . . .".

[3]Barber does not contend that Ablang was "available" to testify at trial or that the confrontation clause of the Washington Constitution provides greater rights to an accused than does the confrontation clause of the United States Constitution. He also does not contend that Ablang's statements were not declarations against penal interest under ER 804(b)(3).

worthiness" test "are the same in substance. They include the circumstances of the declarations themselves, and also other independent evidence of the truthfulness of the statements." 98 Wn.2d at 148 n.1.

To examine the circumstances of the declarations themselves, the court in *Parris* adopted the factors set forth in *United States v. Alvarez*, 584 F.2d 694 (5th Cir. 1978). These are (1) whether there is an apparent motive to lie; (2) the general character of the declarant; (3) whether more than one person heard the statement; (4) whether the statement was made spontaneously; and (5) the timing of the declaration and the relationship between the declarant and the witness. *Alvarez*, at 702 n.10.

The court in *Parris* also stated that the factors set forth in *Alvarez* should be considered in conjunction with those set forth in *Dutton v. Evans*, 400 U.S. 74, 27 L. Ed. 2d 213, 91 S. Ct. 210 (1970). These are (1) whether the statement contained an express assertion about past fact; (2) whether the declarant had personal knowledge of the identity and role of the other participants in the crime; (3) whether the declarant's statement was founded on faulty recollection; and (4) whether the circumstances under which the statement was made provided reason to believe that the declarant misrepresented the defendant's involvement in the crime. *Dutton*, at 88–89.

We now apply the factors set forth in *Alvarez* and *Dutton* to examine the circumstances surrounding Ablang's declarations themselves.

The first factor in *Alvarez* and the fourth factor in *Dutton* are virtually identical: whether the declarant had an apparent motive to lie or whether the circumstances provided reason to believe that the declarant misrepresented the defendant's involvement in the crime. Barber argues that Ablang had a motive to lie. He argues that *Ablang* killed Boy Pilay and told Gayle Corbett that he and Barber killed Boy Pilay to avenge the murder of Barber's uncle only to make his criminal act appear less culpable or blameworthy by shifting the responsibility to Barber as the

person who instigated the crime.

We conclude that Ablang had no apparent motive to lie. Ablang was not in custody and thus had no reason to involve another to curry favor. *See Parris,* at 151. Also, Barber has suggested no motive for Ablang, alone, to have killed Boy Pilay.

We also conclude that the circumstances under which Ablang made his statements provide no reason to believe that he misrepresented Barber's involvement. Ablang volunteered the statements only a few hours after the murder to a person with whom he had a close, confidential relationship.

Regarding the second factor in *Alvarez,* Barber argues that the general character of Ablang made his out–of–court statements unreliable. He points to a number of false statements made by Ablang. These were (1) telling a friend that his car had been wrecked; (2) telling two other people that he had no car because his sister had taken it away from him because he failed to make the payments; (3) telling the person who sold him an airline ticket that he was traveling to the Philippines because his grandmother lived there and was near death; and (4) telling his father that he was traveling to the Philippines because his wife was ill and in a hospital.

We do not agree that the general character of Ablang made his out–of–court declarations unreliable. His false statements were all made after the murder and were consistent with a cover–up by him of his participation in the murder. They were not inconsistent with his statements to Corbett and do not suggest a motive or reason why he would have lied to Corbett.

In regard to the third factor in *Alvarez,* it is true that Gayle Corbett was the only person to hear Ablang's statements.

The fourth factor in *Alvarez* is virtually identical to the first factor in *Dutton:* whether the statements were made spontaneously or whether they were express assertions about past fact. Ablang's statements were not spontaneous

in the sense that they were made contemporaneously with his participation in the murder. They were express assertions about past fact. However, they were made only a few hours after the murder and were volunteered by Ablang. The statements were spontaneous in the sense that he volunteered the information without being questioned.

The fifth factor in *Alvarez* is the timing of the declaration and the relationship between the declarant and the witness. Again, Ablang's statements were made shortly after the murder, were volunteered by Ablang and were made to a person with whom he had an intimate relationship.

Finally, in regard to the second and third factors in *Dutton,* Ablang certainly had personal knowledge of the identity and role of the other participants in the crime, and his statements could not have been founded on faulty recollection because the murder was committed only a few hours before.

Barber also contends that Ablang's out–of–court statements were unreliable because Gayle Corbett's veracity was suspect. Three weeks after the murder, Corbett gave the police a sworn statement in which she did not disclose Ablang's statements to her or the fact that she had picked up Ablang's passport for him and accompanied him, Val Barber and Raul Barber, Jr., to the airport when Ablang fled to the Philippines. Corbett testified that she did not disclose these incriminating details in her first statement because she feared "retribution".

We do not agree that Corbett's deletion of these incriminating facts in her first statement to the police rendered her testimony regarding Ablang's statements unreliable. Her fear of retribution was understandable. Her truthfulness should be considered in conjunction with the factors set forth in *Alvarez* and *Dutton.* She had no apparent motive to lie about what she had been told of Boy Pilay's murder. Since her testimony in court implicated two people in a murder, she would have more motivation not to disclose the incriminating evidence than to testify as she did.

Also, she was available at trial to be cross–examined by Barber about her change in story.

After reviewing the factors set forth in *Dutton* and *Alvarez,* we conclude that the circumstances surrounding Ablang's declarations themselves support their reliability.

We next consider the corroboration of the substance of Ablang's statements. Corroboration of inculpatory declarations against penal interest may be drawn from other evidence of guilt; it is not confined to the circumstances surrounding the declarations. *Parris,* at 152; *State v. Valladares,* 31 Wn. App. 63, 71, 639 P.2d 813 (1982).

First, Barber contends that in a case such as this, in which the hearsay evidence was "crucial" to the prosecution's case or "devastating" to the defendant's case, the other evidence of guilt cannot provide sufficient corroboration to satisfy the defendant's right to confrontation. He relies primarily upon *Dutton v. Evans,* 400 U.S. 74, 27 L. Ed. 2d 213, 91 S. Ct. 210 (1970).

At issue in *Dutton* was the admission at trial of a statement made by an alleged coconspirator of the defendant. In holding that the admission of the statement did not violate the confrontation clause, the plurality did find that the statement was not "crucial" or "devastating" but rather of "peripheral significance". *Dutton,* at 87. However, the plurality also found that the alleged coconspirator who made the statement could have been produced at trial by the defendant. *Dutton,* at 88 n.19. It also noted that the possibility that cross examination by the defendant could have shown the jury that the statement was unreliable was "wholly unreal." *Dutton,* at 89. We do not agree that the Court in *Dutton* held that "crucial" or "devastating" hearsay evidence cannot be found to be reliable and, therefore, admissible under the confrontation clause. Under *Ohio v. Roberts,* 448 U.S. 56, 65 L. Ed. 2d 597, 100 S. Ct. 2531 (1980) and *State v. Parris,* 98 Wn.2d 140, 654 P.2d 77 (1982), if the witness is unavailable and the hearsay evidence reliable, its admission does not violate a defendant's right of confrontation regardless of whether it is "crucial"

or "devastating".

The evidence corroborating Barber's participation in the murder of Boy Pilay was substantial. Pilay was last seen alive in the company of Barber and Ablang as the three of them left the China Gate restaurant in Ablang's car sometime before 9 p.m. on the night of Saturday, January 15, 1983. Pilay was murdered in Ablang's car. Paul Crayton overheard Barber threaten to kill Pilay the summer before Pilay was killed. Raul Monillas overheard Barber offer money for information regarding the murderer of Barber's uncle. Another witness drove Ablang to a meeting with Barber on the Monday after the murder. It was only after this meeting that the witness observed Ablang with a great deal of money. Finally, Barber was unable to produce any alibi witnesses who could account for any substantial period of time on the night of the murder.

### IMPEACHMENT TESTIMONY

Barber also contends that the trial court erred in admitting the impeachment testimony of Boyse Campo, who testified that Raul Monillas told him after Boy Pilay's murder that a price had been put on Campo's head.

Raul Monillas was called as a witness for the State. He testified that he was at the 609 Club from before 9 p.m. until about midnight on the night of the murder and that he did not see Boy Pilay there. He also testified that at a party in 1982, he overheard Barber ask Campo if he knew who had killed Barber's uncle and offer Campo money for information. Monillas denied telling Detective Richard Krogh after the murder that he also overheard Barber tell Campo that he was offering $3,000 to someone to kill his uncle's murderer.

Monillas was asked about a conversation with Campo after Pilay's death. That question and answer are as follows:

Q. All right. And did you tell him that there was a price on his head and on Boy's head?
A. I didn't say that.

Q. You deny saying that to Boyse?

A. I didn't say that.

We note that this question to Monillas did not specify or direct the jury's attention to who had placed the price on Campo's and Boy Pilay's heads. The deputy prosecuting attorney did not ask Monillas if he had stated to Campo that *Barber* had placed a price on Campo's and Boy Pilay's heads. Monillas could have been merely repeating a rumor. No foundation was laid for the question, which makes its relevance very questionable. Even if the jury believed that Monillas had indeed made such a statement, it is unclear how the jury could have logically made use of the statement because no proper foundation had been laid to attribute to Barber the act of offering money to have Campo and Pilay killed.

Boyse Campo was called as a witness for the State to impeach the testimony of Raul Monillas. He was asked what Monillas had told him a few days after Boy Pilay's murder. At this point, Barber objected. After ruling that Campo's testimony was admissible, the trial judge volunteered:

THE COURT: Thank you. I'll admit that it's a close question. I also would suggest that I could give the jury an instruction on how to treat the evidence but I'm afraid it would be more dangerous and damaging than to just overrule the objection.

[DEFENSE COUNSEL]: I understand, your Honor.

Campo then testified as follows:

Q. All right. And the conversation occurred at Raul's place of residence?

A. That's right.

Q. About what time of the day or night?

A. It was in the morning.

Q. All right. What did Raul tell you about what Val said?

A. Raul said, he came to me and said, "Did you know that there was a price on your head?"

Q. A price on your head?

A. Yeah. That means money on your head. He meant me and Boy Pilay.

Q. That was evident from the conversation?
A. Yes, sir.
Q. Okay. Did he say who put the price on your head?
A. No, he didn't really say, but the way I understood him was, it was obviously from Valentino.

We note that it was the deputy prosecuting attorney who first identified Barber as the person who had placed a price on Campo's and Boy Pilay's heads. The deputy prosecuting attorney's question was improper as leading, but Barber did not object. Without an objection, the error was waived. *State v. Boast*, 87 Wn.2d 447, 451, 553 P.2d 1322 (1976). Thus, Campo never testified that Monillas told him that Barber had placed a price on Campo's and Boy Pilay's heads. He only testified that he assumed that was what Monillas meant.

Barber contends that permitting the impeachment testimony was improper because there was no reason to impeach Monillas' testimony apart from his denial that he told Campo that a price had been put on his head.

We do not agree that no other reason existed to impeach Monillas' testimony. Barber testified that he was at the China Gate restaurant between 10 p.m. and midnight on the night of the murder. Arturo Valera testified that he was at the China Gate restaurant between 10 p.m. and midnight and that he never saw Barber there. Thus, Valera's testimony was valuable to the State because it damaged Barber's alibi. Monillas, on the other hand, testified that he saw Valera at the 609 Club (not the China Gate restaurant) between 9 p.m. and midnight that night. Monillas' testimony thus gave the State a reason to impeach Monillas.

Barber also contends the State called Monillas as a witness as a mere subterfuge to get before the jury the testimony of Campo, which would have been inadmissible hearsay otherwise. We do not agree.

■ Although the State may impeach its own witness, it may not call a witness for the primary purpose of eliciting testimony in order to impeach the witness with testimony that would be otherwise inadmissible. *United States v.*

*Miller,* 664 F.2d 94, 97 (5th Cir. 1981); *United States v. DeLillo,* 620 F.2d 939, 946 (2d Cir.), *cert. denied,* 449 U.S. 835 (1980). Monillas' testimony was important to the State's case, however. He strengthened the State's theory of the case by testifying that he was at the 609 Club on the evening of the murder and never saw Boy Pilay after 9 p.m. He also testified that at a party in 1982, he overheard Barber ask Boyse Campo if he knew who had killed Barber's uncle and offer Campo money for information. We conclude that the State did not call Monillas for the primary purpose of eliciting his testimony in order to impeach him with testimony that would have been otherwise inadmissible. We hold that the trial court did not err in admitting the impeachment testimony of Boyse Campo.

We also find that Barber's failure to request a limiting instruction waived error, if any. Failure to request a limiting instruction waives any error that an instruction could have corrected. *See State v. Jefferson,* 6 Wn. App. 678, 683, 495 P.2d 696 (1972). An instruction limiting the jury's use of Campo's impeachment testimony to helping the jury decide the weight and credibility to be given Monillas' testimony very probably would have corrected any prejudice to Barber.[4]

Finally, if the trial court erred in admitting Campo's impeachment testimony, the error, if any, was not of constitutional dimension. Therefore, the error was not prejudicial and thus not reversible, unless, within reasonable probabilities, the error materially affected the outcome of the trial. *State v. Cunningham,* 93 Wn.2d 823, 831, 613 P.2d 1139 (1980).

Detective Krogh testified without objection that on January 28, 1983, Monillas told him that Monillas had overheard Barber offer $3,000 to have his uncle's murderer

---

[4]It is not unusual for able trial counsel to not request a limiting instruction regarding evidence that counsel believes is damaging to the client. Counsel may conclude that more damage may be done by calling the jury's attention to the evidence.

killed. Because Barber did not request an instruction limiting the jury's use of Detective Krogh's testimony, the jury was free to use this testimony as substantive evidence of Barber's guilt. The only difference between Detective Krogh's testimony and Campo's testimony was that Campo identified Boy Pilay and himself as the persons to be killed.

Considering the other evidence pointing to Barber's guilt, especially the other testimony that Barber was willing to pay money for information about his uncle's killer and to have his uncle's killer murdered, we see no reasonable probability that the exclusion of Campo's impeachment testimony would have changed the result in this trial.

Judgment affirmed.

SWANSON and RINGOLD, JJ., concur.

Review denied by Supreme Court January 18, 1985.