# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,

Respondent,

v.

ALEXIS SANCHEZ-BALBUENA,

Appellant.

No. 71653-1-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: July 27, 2015

APPELWICK, J. — Sanchez-Balbuena appeals his conviction for assault in the second degree. He contends that the trial court erred when it permitted the State to call a rebuttal witness for the primary improper purpose of impeaching the witness with otherwise inadmissible hearsay evidence. We affirm.

## FACTS

On July 2, 2013, at 11:47 p.m., Detective Thomas Moriarty[1] responded to a call at the Central Park East Apartments in Bellevue. The caller reported that one male was being assaulted by several other males. Upon arriving, an officer located the victim of the assault, Matthew Koesema—a resident of the Central Park East Apartments.

Earlier that night, Koesema went to a grocery store in the Crossroads area of Bellevue to buy milk. Around 11:45 p.m., Koesema's friend drove him home from the store. The drive from the grocery store to the Central Park East Apartments took roughly seven minutes.[2] Koesema's friend dropped him off in the parking lot and left. As Koesema walked from the parking lot to his building, he was approached by Pablo

---

[1] At the time of the incident, Detective Moriarty was an officer.

[2] Koesema testified that it takes about the same amount of time to drive to the apartments from the Crossroads area as it does to walk, because of the traffic lights.

Delacruz-Perez who asked Koesema if he had been selling drugs.[3] After Koesema denied that he was selling drugs, Delacruz-Perez began to walk away and said that he would beat up Koesema if he found out that he was selling drugs. Koesema continued walking, and approximately 25 seconds later he encountered Alexis Sanchez-Balbuena. Sanchez-Balbuena approached Koesema in a fighting stance and announced, "Hey, this is him right here." Sanchez-Balbuena swung at Koesema, and Koesema used his stun gun on Sanchez-Balbuena. At that point, Koesema turned around and tried to run away, but tripped. Four men appeared and assaulted Koesema.

According to the certification of probable cause prepared by Detective Jeffry Christiansen, when Detective Moriarty arrived at the scene, a witness of the incident informed him that she thought one of the suspects involved in the assault was hiding in a storage closet on the second floor of one of the complex's buildings. Detective Moriarty located the storage closet, and it was locked. While Detective Moriarty waited for an apartment employee to open the closet,[4] Ashley Hamilton walked onto the floor and spoke with Detective Moriarty. Hamilton said that she was Sanchez-Balbuena's best friend and that she was currently staying in his apartment in the building. She further stated that approximately one hour earlier, at 11:30 p.m., she was at the Hagen grocery store in the Crossroads area with Sanchez-Balbuena and Delacruz-Perez. Hamilton said that the group walked back to the Central Park East Apartments together and then went their separate ways.

---

[3] Koesema did not know it was Delacruz-Perez at the time, but later identified him in a photo lineup.

[4] Upon opening the storage closet, the officers found an open window leading to the backside of the apartments. There was no one inside.

The State charged Sanchez-Balbuena[5] and Delacruz-Perez with second degree assault and first degree robbery.

At trial, both defendants presented alibi defenses. Sanchez-Balbuena's wife provided his alibi. Specifically, she testified that she had been with Sanchez-Balbuena at her home[6] on the evening of the assault from 8:00 pm on and that he never left. Delacruz-Perez's mother provided his alibi. She testified that Delacruz-Perez was at her house when she returned home from work the night of the assault at 10:00 pm and that he did not leave the house until the next morning.[7]

After the defense rested its case, the State called Hamilton as a rebuttal witness. The State asserted that it was calling Hamilton in order to rebut the defendants' alibi claims. It told the trial court that Hamilton saw both of the defendants in the area prior to the assault and told the police specifics about the timing of the incident on the day of the assault. The State conceded that as of the time of trial, Hamilton stated that she could not remember how much time elapsed between when she saw the defendants and when the assault occurred. But, the State wished to call her to testify, would attempt to refresh her recollection from Detective Moriarty's police report, and would then attempt to impeach her if that did not work. At that point, the trial court asked for an offer of proof as to the time interval. The State claimed that on the day of the assault, when Hamilton spoke to the police, she stated that she was with the defendants about an hour before. The trial court accepted the offer of proof.

---

[5] Sanchez-Balbuena was eventually arrested in September.

[6] Sanchez-Balbuena's wife lived with her parents in Renton at the time of the incident. He did not live there.

[7] At trial, a detective testified that Delacruz-Perez's cell phone records placed him in the area of the incident on the date and time of the incident.

Sanchez-Balbuena objected to Hamilton's testimony, because he believed the primary purpose for calling her was to then call Detective Moriarty to impeach her testimony once it contradicted her statement on the night of the incident. He argued that Hamilton's statement to Detective Moriarty on the night of the incident—that the defendants had been in the area an hour prior to the assault—was hearsay. And that, by calling Hamilton and offering her statement as impeachment, the State sought to get it in as substantive evidence. Sanchez-Balbuena argued that Detective Moriarty's testimony, if allowed in at all, should be admitted for only impeachment purposes and not as substantive evidence.

The trial court ultimately concluded that Hamilton would be able to testify, because her testimony was of "marginal relevance." The court stated that should Hamilton testify the way that the State anticipated, the use of Detective Moriarty's testimony to impeach her would come in only as impeachment evidence, not substantive evidence.

Hamilton then testified to the following facts: she was living in a storage room at the Central Park East Apartments briefly in July 2013, she was good friends with Sanchez-Balbuena at the time, she did not know if Sanchez-Balbuena was living in the Central Park East Apartments but knew that his mother lived there, and she had seen Sanchez-Balbuena and Delacruz-Perez together on other occasions.

Hamilton also testified about the day of the incident. She stated that, earlier that day, she had seen the defendants together in the Crossroads area around a mini mart and the Hagen grocery store—nearby the apartment complex where the assault occurred. She also testified that she spoke with the police that day at the Central Park East

4

Apartments near the storage closet. But, she denied speaking with the officers about Sanchez-Balbuena and Delacruz-Perez.

Hamilton stated that she could not estimate how long it was between seeing the defendants in the area and speaking with the police after the assault.[8] But, Hamilton remembered and clearly described what she had done in the time period between seeing the defendants near the scene together and when she spoke with the police. She testified that she saw the defendants around the mini mart and the Hagen grocery store in the Crossroads area while she was with her friend. After Hamilton left the Hagen grocery store, she walked her friend to a bus stop and then walked back to the apartment complex. The apartment complex was approximately a five minute walk from the Crossroads area. Hamilton testified that when she left the Crossroads area, she went straight to the gym in the apartment complex for 30 to 45 minutes. She encountered Detective Moriarty on her way back from the gym. When asked if she did anything besides go to the gym between when she left the Crossroads area and when she went into the apartment complex, Hamilton responded, "Nothing."

When asked if she remembered telling the officers that she and Sanchez-Balbuena and Delacruz-Perez had walked from the Hagen grocery store together to the apartment complex, Hamilton said she did not. And, again, she stated that she could not say what time specifically she saw Sanchez-Balbuena and Delacruz-Perez together. On cross-examination, Hamilton was again asked about when she saw the two defendants

---

[8] Hamilton also testified that she was a daily drug user. And, on the day of the incident she had been drinking and using drugs.

5

together. When asked specifically if the sun was out, Hamilton testified only that it was light outside.

The State then called Detective Moriarty to testify. Sanchez-Balbuena renewed his objection. Detective Moriarty testified that Hamilton spoke to him the night of the incident. He claimed she stated that she had been with Sanchez-Balbuena at the Hagen grocery store about an hour before speaking with him and that she and Sanchez-Balbuena had walked back to the complex together. He further stated that Hamilton said that Sanchez-Balbuena was her best friend.

Prior to deliberations, the jury was provided the following jury instruction:

> The Court is allowing evidence concerning statements allegedly made by Ashley Hamilton to Detective Moriarty on July 2, 2013, but you may consider the answers only for the purpose of impeaching the credibility of Ashley Hamilton. You must not consider the answers for any other purpose.

The jury convicted Sanchez-Balbuena of assault in the second degree. Sanchez-Balbuena appeals the judgment and sentence.

## DISCUSSION

Sanchez-Balbuena argues that the trial court erred when it permitted the State to call Hamilton as a witness, because there was no independent relevance of her testimony beyond its use as a conduit to admit otherwise inadmissible evidence. He contends this is so, because the State knew that Hamilton was not going to testify that she saw the two defendants together in the neighborhood shortly before the assault, and therefore, that her testimony would not rebut their alibis. He claims that the State called Hamilton only so that it could call Detective Moriarty to impeach Hamilton when she inevitably contradicted her earlier statement to Detective Moriarty that she saw the two together

6

within an hour of the assault. He asserts that the improper admission of Hamilton's testimony requires reversal, because the evidence had a substantial likelihood of effecting the verdict.

The decision to admit evidence lies within the sound discretion of the trial court and should not be overturned on appeal absent a manifest abuse of discretion. State v. Crenshaw, 98 Wn.2d 789, 806, 659 P.2d 488 (1983). ER 607 states that the credibility of a witness may be attacked by any party, including the party calling the witness.

Although the State may impeach its own witness, it may not call a witness for the primary purpose of eliciting testimony in order to impeach the witness with testimony that would be otherwise inadmissible. State v. Barber, 38 Wn. App. 758, 770-71, 689 P.2d 1099 (1984). The underlying concern is that prosecutors may abuse the rule by calling a witness they know will not provide useful evidence for the primary purpose of introducing hearsay evidence against the defendant. State v. Hancock, 109 Wn.2d 760, 763, 748 P.2d 611 (1988). This tactic seeks to exploit a jury's difficulty in making the subtle distinction between impeachment evidence and substantive evidence. Id. The motivation in such instances is less to impeach the witness than to introduce hearsay as substantive evidence, contrary to ER 802—the rule against hearsay.[9] Id.

In State v. Lavaris, 106 Wn.2d 340, 346, 721 P.2d 515 (1986), the Washington Supreme Court considered whether the State's primary purpose of calling a witness was to elicit impeachable testimony. The court stated that it must determine whether the

---

[9] "Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. ER 801(c).

State's impeachment of its own witness by prior inconsistent statements was "employed as a mere subterfuge to place before the jury evidence not otherwise admissible." Id.

In Lavaris, Lavaris and Castro were charged of first degree murder. Id. at 341. The two were charged separately and convicted, but Lavaris's conviction was reversed and remanded. Id. Prior to Lavaris's retrial, defense counsel learned that the State intended to call Castro as a witness. Id. at 342. The prosecutor and defense counsel were aware that Castro would not incriminate Lavaris in the murder. Id. But, the State wanted to call Castro as a witness, because his testimony was relevant to the testimony of the State's key witness and because Castro had made a prior statement to police detectives implicating Lavaris in the murder. Id.

At trial, defense counsel objected to the prosecution questioning Castro on the basis that it was merely an attempt to bring before the jury the detectives' otherwise inadmissible statement of what Castro had allegedly said to them previously. Id. Castro previously made the statement at the state penitentiary, not under oath or signed, and the statement was kept only in informal notes of Castro's responses to questions. Id. Still, the trial court ruled that the State could call Castro as a witness and that his prior inconsistent statement could be admitted through the detective's testimony. Id. After Castro testified, denied seeing Lavaris at the scene of the crime, and denied seeing Lavaris kill the victim, the detective testified that Castro had told him that Lavaris killed the victim. Id. at 342-43. Lavaris was convicted. Id. at 343.

In affirming the conviction, the Washington Supreme Court stated that Castro's testimony was essential in many areas of the State's case. Id. at 346. It reasoned that Castro was integrally involved in the events leading up to the murder, that his testimony

corroborated the testimony of the main witness concerning the circumstances (dates, times, and places) leading up to the murder, and he corroborated the witness's testimony in other respects. Id. The Lavaris court ultimately concluded that the State did not call Castro for the primary purpose of eliciting his testimony in order to impeach him with testimony that would have been otherwise inadmissible. Id. at 347. It held that the trial court did not err when it admitted Castro's impeachment testimony. Id.

The Washington Supreme Court considered a similar issue in Hancock. 109 Wn.2d at 762. In Hancock, Roberta Hancock, the wife of a defendant accused of indecent liberties on his nephew and incest and rape of his son, testified for the State. Id. at 761. On direct examination, she denied suspecting anything improper between her husband and the children and denied that he had ever told her of any improper conduct. Id. After Roberta's direct-examination, the State called a detective to testify. Id. He testified as to out-of-court statements Roberta made to him previously. Id. According to the detective, shortly after her husband's arrest, Roberta told him that she had suspected something was going on between her husband and one of the children, that her husband told her what he had done to the other child, and that she was afraid of him. Id. at 761-62. Hancock was convicted. Id. at 762.

On appeal, Hancock argued that the prosecutor knew that Roberta would not testify favorably to the State and that the primary purpose in calling her as a witness was mere subterfuge to admit her prior inconsistent statements under the guise of impeachment. Id. The court concluded that, because Roberta provided testimony which affirmatively supported the defense—not just flat denials of making any statements to police investigators—the subsequent impeachment of her testimony was proper to rebut

9

her testimony supporting the defense and to impeach her credibility. Id. at 765, 767. The Hancock court further reasoned that the State was entitled to expect Roberta to testify under oath no differently from the apparently voluntary statement she gave to the detective. Id. at 765.

Here, the State argues that its primary purpose for calling Hamilton to testify was not to impeach her, but to rebut the defendants' alibis. Sanchez-Balbuena's alibi placed him at his wife's home in Renton by 8 p.m. Therefore, Hamilton's testimony is relevant to rebut Sanchez-Balbuena's alibi if her testimony tends to prove that she saw the defendants sometime after roughly 8:00 p.m.

Under Hancock, the State was entitled to expect Hamilton to testify under oath no differently from the apparently voluntary statement she provided to Detective Moriarty. 109 Wn.2d at 765. Therefore, the State was entitled to believe that Hamilton's testimony would place Sanchez-Balbuena and Delacruz-Perez in the area less than an hour before the assault.

And, like Castro's testimony in Lavaris, Hamilton's testimony, even if not as favorable to the State's case as was her original statement to Detective Moriarty, was still helpful to and circumstantially corroborative of the State's case. Hamilton's testimony placed Sanchez-Balbuena and his codefendant together a five minute walk from the scene of the incident on the day of the incident.[10] Her testimony about what she had done in the time period between seeing the defendants together and when she spoke with the police calls into question the essential time frame of Sanchez-Balbuena's alibi.

---

[10] Although other evidence in the record—cell phone records—place Delacruz-Perez in the vicinity at the time of the assault, Hamilton's testimony is important to place the two together.

Police officers were dispatched to the scene of the assault at 11:47 p.m. Detective Moriarty spoke with a witness on the second floor of the building who told him that she suspected a suspect was hiding in the storage closet. Detective Moriarty checked the storage closet, and it was locked. Detective Moriarty waited by the storage closet for the apartment maintenance staff to arrive with a key to open the closet. At this point in time—sometime after 11:47 p.m.—Hamilton walked into the area.

Hamilton had just come from the gym downstairs where she had been working out for 30 to 45 minutes. Prior to working out in the gym, Hamilton walked her female friend to a bus stop and walked back to the gym at the apartment complex. Immediately before that, she was in the Crossroads area where she saw Sanchez-Balbuena and Delacruz-Perez. When asked what else she did before leaving the Crossroads area and walking back to the apartment complex, she said, "Nothing." Assuming Hamilton saw the officers at 11:47 p.m. when they first arrived, rather than later, Hamilton's testimony is at least circumstantial evidence that she arrived at the gym around 11:00 p.m. A reasonable juror could infer from the timeline in her testimony that Hamilton's contact with Sanchez-Balbuena occurred well after 8:00 p.m., thereby undermining his alibi.[11]

---

[11] Sanchez-Balbuena argues that Hamilton's testimony was not particularly relevant, because Hamilton testified that she saw Sanchez-Balbuena and Delacruz-Perez when it was light outside. But, the fact that it was light outside when Hamilton saw Sanchez-Balbuena does not render Hamilton's rebuttal testimony completely irrelevant. The incident happened on July 2—less than two weeks after the longest day of the year. Moreover, when asked if the sun was out, Hamilton did not confirm and responded instead that "[i]t was light outside." A reasonable juror could conclude that Hamilton saw Sanchez-Balbuena around the mini mart and Hagen grocery store after 8:00 p.m. notwithstanding the fact that she testified it was light outside. A reasonable juror could also disbelieve this testimony in light of Detective Moriarty's impeachment testimony.

Moreover, at trial, Hamilton testified with precision when discussing the details of the day—that she had consumed alcohol that morning, that she saw the defendants together in the Crossroads area near the mini mart and Hagen grocery store, that she had walked a specific female friend to the bus stop, that she walked from the Crossroads area to the apartment complex and went directly to the gym, that she did not walk back to the apartments with Sanchez-Balbuena, and that she was at the gym for 30 to 45 minutes. And, Hamilton was clear she did not speak to officers about the defendants. However, her memory failed her concerning the specific time of the day she saw the two men or how long before her conversation with the police she had seen them—pieces of evidence which could directly rebut her friend's alibi and incriminate him.

Considering Detective Moriarty's testimony for impeachment purposes only, as the jury was instructed, Hamilton's testimony—that she had not spoken to officers about the defendants and that she did not know when that day she had spoken to the defendants in the Crossroads area—was impeached. A reasonable juror could conclude that this portion of Hamilton's testimony, favorable to the defendants, was not credible. This, in turn, would strengthen the inference a reasonable juror could draw that Hamilton had contact with the defendants after 8:00 p.m. It was not necessary for the jury to misuse the impeachment testimony in order for the State to undermine the defendant's alibi through Hamilton's testimony. We conclude the primary purpose of introducing Hamilton's testimony was not to obtain otherwise inadmissible impeachment testimony of Detective Moriarty.

We hold that the trial court did not abuse its discretion in admitting Hamilton's testimony. We also hold that the trial court did not abuse its discretion in admitting the testimony of Detective Moriarty for the limited purpose of impeaching Hamilton.

We affirm.

Appelwick, J.

WE CONCUR:

Dwyer, J.

Becker, J.