IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 30640-2-III |
| Respondent, | ) | (consolidated with |
| | ) | No. 30641-1-III) |
| v. | ) | |
| | ) | |
| GARY DALE ENGELSTAD, JR, | ) | |
| JOSEPH LEE SHOUSE, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellants. | ) | |

FEARING, J. — A jury found Joseph Shouse and Gary Engelstad guilty of two

counts of robbery in the first degree, three counts of assault in the second degree,

burglary in the first degree, and unlawful possession of a firearm in the first degree. Both

defendants raise numerous issues on appeal: Whether sufficient evidence supports their

convictions? Whether prosecutors engaged in misconduct? Whether second degree

assault merges with first degree robbery? Whether dismissal of counts eight and nine,

theft in the second degree, negates an essential element of the first degree robbery

offenses? In addition, Shouse and Engelstad filed statements of additional grounds,

arguing ineffective assistance of counsel, cumulative trial court errors, prosecutorial

misconduct, and jury tampering. The charges stem from erratic behavior of Shouse and Engelstad, with their companions, on October 20, 2011, at the property of Gerald Moccardine.

## FACTS

An understanding of the criminal charges requires some background. Victim Gerald Moccardine makes his living collecting scrap metal and other "junk." To acquire the scrap metal, Moccardine often scouts his environs looking for businesses or residences where cars or other junk have accumulated. In early October 2010, Gerald Moccardine saw cars and other potentially valuable scrap metal at Joseph Shouse's charred home. Moccardine approached Shouse at his home and asked whether he could collect the scrap metal and other junk littered around his property. According to Moccardine, Shouse gave him permission to take some, but not other, scrap.

On October 13, 2010, Gerald Moccardine and a friend went to Joseph Shouse's home late at night to collect the offered scrap metal. While they loaded the junk into Moccardine's van, Shouse and two of Shouse's friends arrived. Shouse demanded they put everything back. Moccardine testified he returned all objects. Joseph Shouse and his friend Gary Engelstad believed Moccardine stole some property.

On October 17, Joseph Shouse and Gary Engelstad drove to Gerald Moccardine's property. Moccardine considered the visit to be friendly and invited the two into his house trailer. Dawn Flood, who stayed with Moccardine at the time, was inside the

2

trailer. Flood concluded that Engelstad and Shouse were angry with Moccardine. She testified that Shouse carried a hammer and asked her, apparently outside of Moccardine's earshot, if she would "freak out" if he smashed Moccardine's hands with it. Report of Proceedings (RP) at 182. She asked him if it mattered, and continued "visiting" with Shouse and Engelstad because she "didn't want any problems." RP at 181.

Gerald Moccardine showed Joseph Shouse around Moccardine's property. As the two walked the property, Gary Engelstad searched the trailer. After Shouse and Engelstad left the property, Moccardine noticed several objects missing, including an air gun and old tools.

Two days later, on October 19, Julie Curry went to Gerald Moccardine's property to get snow tires. The sun set before Moccardine could place the tires on Curry's car. So Curry decided to spend the night with Dawn Flood and Moccardine inside the trailer. The presence of Curry and Flood compound the charges against Joseph Shouse and Gary Engelstad.

Before retiring to bed, Curry decided to retrieve cigarettes from her van. When she opened the trailer door, she saw four people standing around her van. Surprised to see people, she called to Moccardine and Flood, "there is people here." RP at 408. Gerald Moccardine and Dawn Flood came to the trailer door. Four people then walked from Julie Curry's van toward the trailer door. Flood and Moccardine recognized two of them as Joe Shouse and Gary Engelstad. Curry recognized one of them as Gary

3

Engelstad. Stephanie Van Comen, the mother of Joseph Shouse's son, was also present with Shouse and Engelstad, although Moccardine, Flood, and Curry did not see her.

After reaching the door to Moccardine's trailer, Joe Shouse asked Moccardine and Dawn Flood why they complained to the police about him. Moccardine and Flood denied having contacted the police. Gary Engelstad then approached Moccardine and said "this is the second time I have had to deal with you on a car deal," and he told Moccardine that he was going to take his alternators. RP at 300. Moccardine said, "nobody is taking nothing from here." RP at 299. Engelstad then hit Moccardine in the face. Moccardine backed into his trailer, and Engelstad followed. Engelstad threw an object that struck Moccardine in the head, causing him to bleed.

Upon Gerald Moccardine being struck, his billfold fell off a table and onto the floor. Moccardine bent to retrieve the billfold, as Gary Engelstad asked, "what are you after," and brandished what appeared to be a firearm. RP at 308. Dawn Flood, in an attempt to stop Engelstad, tugged on his sweat shirt, exclaiming "knock it off," "come on," "why do you got to pull a gun?" RP at 199. Flood testified at trial that Engelstad did not point the gun at her and that she did not feel threatened by Engelstad.

At trial, Julie Curry testified that Gary Engelstad pointed the gun "at all of us more or less . . . because we were all standing close together but mostly at [Moccardine]." RP at 414. Moccardine testified, "Say I seen [Engelstad] holding the gun . . . . [I]t could have been a pipe[;] all I seen was a[n] octagonal barrel." RP at 311.

4

As a result of Engelstad's pointing his gun, Curry feared for her safety.

During trial, the State asked if she felt threatened by the gun? Curry responded:

> Yeah, because mostly because I felt maybe not so much that it was—I
> mean I don't want to believe anybody was going to get shot or anything but
> it was just getting—it was getting scary because the jostling and everything
> I thought perhaps it would go off accidentally, yeah, I was a little worried.

RP at 416. The State asked further if Curry was afraid for her safety? Curry replied,

"Yeah, I was at that point just trying to back out[;] I was like trying to duck out under

people's arms and stuff and get back." RP at 416.

With weapon in hand, Gary Engelstad took Gerald Moccardine's wallet and the

$15 therein. Julie Curry went outside to her van to calm her barking dogs. After Curry

left the trailer, a third person entered the house trailer brandishing a weapon. Upon

entering, he moved the gun with his gaze across the trailer in a sweeping fashion. Gary

Engelstad lowered his weapon and went outside. The third man then demanded Dawn

Flood's and Gerald Moccardine's cell phone batteries and said, "you ain't going outside

now." RP at 315. He holstered his weapon, but straddled the trailer door until the gang

of four left. Julie Curry testified that the "person standing at the doorway . . . was

holding a gun on [Moccardine] and [Flood] to keep them" in place. RP at 422.

While the third man stood guard, Gary Engelstad, Joseph Shouse, and a fourth

man rummaged through the various trailers on Moccardine's property. During this time,

Shouse approached Julie Curry while she stood on the steps of her van, called out to her,

and identified himself. Curry then recognized Shouse. Shouse told Curry her van blocked their access to a trailer and asked her to move it. Curry complied. After Curry moved her van, she laid down inside it.

For the next 45 to 90 minutes, Julie Curry, Dawn Flood, and Gerald Moccardine heard people opening and closing cars and trailers and moving objects. None of them saw anyone take any scrap.

After Gary Engelstad, Joseph Shouse, and their two to three companions left Gerald Moccardine's property, Dawn Flood and Moccardine discovered two crown royal bags of Flood's jewelry, Flood's son's Play Station Portable, Moccardine's welder, torch, and various other tools missing.

## PROCEDURE

The State charged Gary Engelstad and Joseph Shouse each with nine crimes as follows:

1. Robbery in the first degree by taking personal property of Gerald Moccardine by the use of force and, in the course of the robbery, being armed with a deadly weapon, displaying what appeared to be a deadly weapon, or inflicting bodily injury on Moccardine;

2. Assault in the second degree upon Gerald Moccardine with a deadly weapon, the handgun;

3. Robbery in the first degree by taking personal property of Dawn Flood by the

6

use of force and, in the course of the robbery, being armed with a deadly weapon, displaying what appeared to be a deadly weapon, or inflicting bodily injury on Flood;

4. Assault in the second degree upon Dawn Flood with a deadly weapon, the handgun;

5. Assault in the second degree upon Julie Curry with a deadly weapon, the handgun;

6. Burglary in the first degree by entering the building of Gerald Moccardine while armed with a deadly weapon or during which Moccardine was assaulted;

7. Unlawful possession of a firearm in that each had prior disqualifying crimes;

8. Theft in the second degree by taking auto parts and tools of Gerald Moccardine valued at more than $750; and

9. Theft in the second degree by taking jewelry of Dawn Flood valued at more than $750.

Shouse and Engelstad were charged as both a principal and an accomplice on each count. The charges against both were heard during the same trial. We are unaware of any charges against the third and fourth men.

At trial the State called as witnesses several responding police officers, Gerald Moccardine, Dawn Flood, Julie Curry, and Stephanie Van Comen. Because Shouse and Engelstad contend the prosecutor's examination of those witnesses amounted to misconduct, we recount some of the testimony the State elicited from a responding

7

officer and Stephanie Van Comen.

Corporal James Nale interviewed Dawn Flood after the night of October 19.
During the course of the State's direct examination of Nale, the State asked if Nale made any observation during that interview? Nale responded that Flood "was candid and open with me and answered all my questions without hesitation." RP at 87. Then the State asked whether he completed any training or courses regarding witness interviews. Nale replied he had, and this exchange followed:

> Q. And what does that consist of?
> A. Consists of basic law enforcement academy and then it consists of just experience and then also going through specific training for interviewing such as go[ing] through the Reed [sic] technique, which is a specific interview and interrogation training that touches on things such as, you know, body language, behavior, speech patterns and stuff and it was a—

RP at 88. At that point, Engelstad's attorney interjected, "[c]ould we have a side bar, please[?]" RP at 88. The court consented and held a sidebar off the record. When the jury left, the court described the sidebar as follows: "Mr. Young brought up the Read technique [sic] that officer had testified to and just trying to I think give [the prosecutor] a warning. I think I didn't rule at all. I didn't make any ruling." RP at 92.

After the sidebar, the prosecutor continued questioning Corporal Nale:

> Q. And as you're interviewing individuals, are you assessing their demeanor?
> A. Yes.
> Q. Is that a factor in your—because I believe you testified that you felt she was not being false with you that you had—

8

> [Englestad's Attorney]: Objection. That's exactly what we were talking about?
> THE COURT: I'll sustain the objection.
> [Prosecutor]: State has no further questions.

RP at 89. None of the parties requested a limiting instruction or the court to strike any portions of Nale's testimony.

Later during trial, the prosecutor examined Stephanie Van Comen. During the questioning, he asked her to explain why she agreed to testify. Van Comen testified that the State offered to resolve her burglary charges and help her get her kids back. In exchange, she explained, she was to tell "the truth." RP at 500.

Despite her agreement, the State contended Stephanie Van Comen perjured herself on the stand and sought to impeach her during its direct examination by inquiring about conflicting statements she provided law enforcement during pretrial interviews. Police interviewed Van Comen several times before trial. In the first interview, Van Comen stated she had observed Shouse with a shotgun. Later, she recanted, claiming she made up the statement to retaliate for Shouse's infidelity. She affirmed the other statements she made in her first interview. At trial, however, Van Comen disavowed even these statements she had previously affirmed. It is in this context the State questioned Van Comen about the shotgun, asking her why she did not correct all of her statements in her second interview, when she recanted ever seeing Shouse with a shotgun.

During the closing arguments of this case the prosecutor began by asking the jury

9

to think about who the victim is in this case. "Is the victim Gerald Moccardine? Is the victim Dawn Flood? Is the victim Julie Curry?" RP at 642. The prosecutor asked this question "because it appears to [him] that throughout the questioning by counsel for Mr. Shouse and Mr. Engelstad that they want you [the jury] to believe that [Shouse and Engelstad] are the victims in this case." RP at 642. But "[t]he only information that's been elicited in this trial about Mr. Shouse and Mr. Engelstad being victims of theft have come from victims who have said [Shouse] told me Mr. Moccardine took things." RP at 646. The prosecution continued:

> However, did we get a sense from any witness that attempted to testify as to items taken what those items were? We did I guess with Ms. Van Comen sort of get here because . . . she talked about property that she believed may have been taken that [Shouse] told her about . . . . [But] [s]he was impeached with the inconsistency in her statement provided to law enforcement and those that were provided in court. That goes to her credibility. And so even if she had maybe provided a list earlier who would that list have come from? Mr. Shouse because again she didn't see anything. Now Mr. Shouse had the opportunity to provide us with the information as to what he claimed Mr. Moccardine took did he not?

RP at 646. At this point, Shouse's attorney objected. The court did not respond and the prosecutor continued. "Mr. Shouse had a contact with Officer Baird" three days after the armed robbery. RP at 646. "And in denying any involvement with that, he told Officer Baird . . . there have been people coming and going from here stealing my stuff too." RP at 647. Officer Baird asked, "Do you know who?" RP at 647. Shouse "suspected Gerald Moccardine." RP at 647. Baird asked, Shouse "[w]hy [do you] suspect him? Did [you]

see him? Does he have your property? Give me information. Tell me what's missing." RP at 647. But "Shouse appeared not really to want to provide any of that. Said he had no proof. Seemed as if he just wanted to get rid of [Baird]." RP at 647.

Upon conclusion of trial, a jury convicted Joseph Shouse and Gary Engelstad of all charges: two counts of robbery in the first degree, three counts of assault in the second degree, burglary in the first degree, two counts of theft in the second degree, and unlawful possession of a firearm in the first degree. At sentencing the State stipulated that the two charges of theft in the second degree merge with the two counts of robbery in the first degree. The court dismissed the two counts of theft in the second degree with prejudice.

On appeal Joseph Shouse and Gary Engelstad argue they neither robbed nor assaulted Dawn Flood or Julie Curry because they did not take anything from Flood's person or in her presence and they did not point the weapon that looked like a firearm at Flood or Curry. In addition, they argue the State failed to prove Engelstad brandished a real, working firearm. Shouse argues the State failed to prove he was an accomplice or that he had actual or constructive possession necessary to support a conviction for unlawful possession of a firearm in the first degree. But if this court finds sufficient evidence supports their convictions, they urge this court to vacate their convictions because the prosecutor engaged in misconduct. At the very least, they contend this court

11

must merge their second degree assault convictions with their first degree robbery convictions.

Shouse and Engelstad also filed statements of additional grounds. In those statements, they argue counsel provided ineffective assistance, the trial court denied them due process by refusing to split their trials and failing to instruct the jury of their Fifth Amendment rights, that the prosecutor engaged in misconduct, insufficient evidence supports their burglary conviction, and cumulative errors denied them a fair trial.

## LAW AND ANALYSIS

ISSUE 1:

Does sufficient evidence establish Joseph Shouse's accomplice liability?

ANSWER 1:

Yes.

Joseph Shouse first contends the State failed to prove beyond a reasonable doubt his liability as an accomplice to any of the charged crimes. In this section, we exclude from discussion accomplice liability for the crime of unlawful possession of a firearm. That question deserves additional analysis and will be addressed below.

RCW 9A.08.020(3) defines when a person is an accomplice. The statute states:

> A person is an accomplice of another person in the commission of a crime if:
>
> (a) [w]ith knowledge that it would promote or facilitate the commission of the crime he

12

(i) [s]olicits, commands, encourages, or request such other person to commit it; or

(ii) [a]ids or agrees to aid such other person in planning or committing it; or

(b) [h]is conduct is expressly declared by law to establish his complicity.

Mere presence at a crime scene is insufficient to convict under accomplice liability. *State v. Rotunno*, 95 Wn.2d 931, 933, 631 P.2d 951 (1981). To prove that one present is an aider, it must be established that one is "ready to assist" in the commission of the crime. *Rotunno*, 95 Wn.2d at 933 (citing *In re Wilson*, 91 Wn.2d 487, 491, 588 P.2d 1161 (1979)). The law holds an accomplice equally culpable as the principal, regardless of which one actually performed the harmful act. *State v. Silva-Baltazar*, 125 Wn.2d 472, 886 P.2d 138 (1994); *State v. McDonald*, 90 Wn. App. 604, 611, 953 P.2d 470 (1998), *aff'd*, 138 Wn.2d 680, 981 P.2d 443 (1999). All that is required is that the accomplice has encouraged, rendered assistance, or aided in the planning or commission of the crime. *State v. McDonald*, 90 Wn. App. at 611 (1998).

When a defendant challenges the sufficiency of the evidence underlying his conviction, a reviewing court views the evidence in the light most favorable to the State and asks whether any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. *State v. Green*, 94 Wn.2d 216, 220-21, 616 P.2d 628 (1980). The reviewing court considers circumstantial evidence equally reliable as direct evidence. *State v. Myers*, 133 Wn.2d 26, 38, 941 P.2d 1102 (1997); *State v. Delmarter*, 94 Wn.2d

13

634, 638, 618 P.2d 99 (1980). "Credibility determinations are for the trier of fact and cannot be reviewed on appeal." *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).

We conclude that the jury heard more than sufficient evidence to convict Joseph Shouse of either principal or accomplice liability for all crimes committed. Shouse was much more than merely present at Gerald Moccardine's property during the commission of the crimes. He likely instigated the crimes. He certainly participated in the crimes. Joseph Shouse and his colleagues came together, searched Moccardine's property together, held people captive together, took personal property of others together, and left together.

Witnesses testified that around October 13, Shouse came home to find Moccardine loading his things into a van. Shouse was mad and demanded Moccardine and his friend put everything back. Moccardine testified he did, but testimony suggests Shouse did not believe him.

On October 17, Joseph Shouse and Gary Engelstad went to Gerald Moccardine's property. While there, they searched for Shouse's property. Dawn Flood testified that as Shouse and Engelstad looked through the items on Moccardine's property, Shouse would identify what he believed was his. After they left, Moccardine discovered several items missing.

On October 19, Joseph Shouse, Gary Engelstad, Stephanie Van Comen and others went to Gerald Moccardine's property in two separate cars, but arrived at the same time. Once at Moccardine's property, Van Comen saw Engelstad, Shouse, and others rummaging through Moccardine's property. Julie Curry testified that Shouse identified himself and asked her to move her van so that they may access one of Moccardine's trailers. Engelstad, Shouse, and others later returned to her and Shouse's home. The evidence, with reasonable inferences drawn in favor of the State, shows Shouse actively encouraged or requested Engelstad and others to go to Moccardine's property with the intent of retrieving items he believed Moccardine previously stole from him.

ISSUE 2:

Does sufficient evidence support Joseph Shouse and Gary Engelstad's conviction for first degree robbery against Dawn Flood?

ANSWER 2:

Yes.

Shouse and Engelstad argue that first degree robbery requires the State establish beyond a reasonable doubt that each threatened use of force with the intent to unlawfully take Dawn Flood's personal property from her person or in her presence. They argue the State failed to establish that they either threatened Flood or that they took property from her or in her presence. Actually, the State need only prove that one of the defendants or another of their cohorts threatened Flood with a deadly weapon and took Flood's

15

property from her person or in her presence. RCW 9A.56.200. The jury heard sufficient evidence that one of the defendants or an accomplice performed such acts.

Dawn Flood was threatened and had her personal property stolen in her presence. The second gunman who swept the trailer with his gun and stood guard by the trailer door threatened Flood and Moccardine with force if they tried to leave. Where such threats preclude a person from being present when their property is stolen, his or her physical presence is not required. *State v. Chamroeum Nam*, 136 Wn. App. 698, 705, 150 P.3d 617 (2007). Julie Curry testified that the person standing at the doorway held a gun on Moccardine and Flood to keep them stationary. The threat by the second gunman prevented Flood from being physically present at Moccardine's car when a member of the group took the two crown royal bags full of jewelry from it. This conduct constitutes first degree robbery.

Joseph Shouse and Gary Engelstad also contend that no property was taken from the person or in the presence of Dawn Flood. But "a taking of personal property can occur in the presence of the victim even though the victim was not immediately present." *State v. Stearns*, 61 Wn. App. 224, 229, 810 P.2d 41 (1991). Where force or fear prevents a victim from approaching the place of theft, the taking occurs in his or her presence. *State v. McDonald*, 74 Wn.2d 141, 144, 443 P.2d 651 (1968). Julie Curry testified that the person standing at the doorway held a gun on Moccardine and [Flood] to keep stationary. The man standing in the doorway prevented Flood from being present

16

when Shouse, Engelstad, and others rummaged through her property. Later that night Van Comen observed Engelstad and another man sifting through a crown royal bag filled with jewelry, personal property of Dawn Flood.

ISSUE 3:

Does sufficient evidence support the jury's finding that Gary Engelstad and Joseph Shouse assaulted Dawn Flood?

ANSWER 3:

Yes.

Joseph Shouse and Gary Engelstad next contend the State failed to establish beyond a reasonable doubt that either intentionally assaulted Dawn Flood with a deadly weapon. This argument is also misplaced. Since both were charged with accomplice liability, the State need only prove that a member of the group at the Moccardine property assaulted Dawn Flood with a gun.

One is guilty of second degree assault when one assaults another with a deadly weapon or with intent to commit a felony. RCW 9A.36.021. Because assault is not defined in the criminal code, the courts rely upon the common law definition of assault, one of which is to place a person in fear of bodily injury by the use of a weapon that has the apparent power to do harm. *State v. Carlson*, 65 Wn. App. 153, 158, 828 P.2d 30 (1992). While Dawn Flood downplayed her fear of the gun Engelstad brandished, she feared the second man who swept the room with gun in hand. She evidenced her fear by

17

staying in the trailer while others rummaged through her property. This testimony,

viewed in the light most favorable to the State supports the jury's finding that Shouse and

Engelstad threatened Flood with the bodily harm, and that she reasonably feared

imminent bodily injury.

ASSAULT IN THE SECOND DEGREE: JULIE CURRY

ISSUE 4:

Does sufficient evidence support Joseph Shouse and Gary Engelstad's conviction

for the second degree assault of Julie Curry?

ANSWER 4:

Yes.

Joseph Shouse and Gary Engelstad also contend the State failed to establish

beyond a reasonable doubt that they intentionally assaulted Julie Curry. To convict a

defendant of second degree assault, the jury must find specific intent to create reasonable

fear and apprehension of bodily injury. *State v. Ward*, 125 Wn. App. 243, 248, 104 P.3d

670 (2004), *abrogated on other grounds by State v. Grier*, 171 Wn.2d 17, 246 P.3d 1260

(2011) (citing *State v. Byrd*, 125 Wn.2d 707, 713, 887 P.2d 396 (1995)). Intent may be

inferred from pointing a gun. *Ward*, 125 Wn. App. at 248.

Engelstad pointed the gun at Curry, among others. Curry testified that she felt

threatened and feared for her safety as a result. A jury may reasonably infer from the

direction Engelstad pointed his weapon that he intended to create in Curry an

18

apprehension and fear of imminent bodily injury. In fact, that is what Curry felt. Curry feared for her safety as evidenced by her jostling and ducking under the arms of Moccardine and Flood to avoid any bullet fired by Engelstad. Viewed in the light most favorable to the State, any rational jury could find that Engelstad and Shouse committed second degree assault against Julie Curry.

ISSUE 5:

Does sufficient evidence support Joseph Shouse's convictions for unlawful possession of a firearm in the first degree?

ANSWER 5:

No.

RCW 9.41.040 makes it illegal for a felon to possess a firearm. In relevant part RCW 9.41.040 provides:

> (1)(a) A person, whether an adult or juvenile, is guilty of the crime of unlawful possession of a firearm in the first degree, if the person owns, has in his or her possession, or has in his or her control any firearm after having previously been convicted or found not guilty by reason of insanity in this state or elsewhere of any serious offense as defined in this chapter.

Both Gary Engelstad and Joseph Shouse had previous convictions for serious offenses that disqualified each from possessing a firearm. Shouse was charged with unlawful possession of a firearm both as a principal and an accomplice. Thus, we must determine whether the jury heard sufficient evidence to convict him as, first, a principal, and second, an accomplice. We do not know if the man stationed at the trailer threshold

had a conviction disqualifying him from possessing a firearm. So, if Shouse is guilty as an accomplice to someone else's unlawful possession, it must be based upon possession of the gun by Gary Engelstad.

Under the statute, the State may prove a felon unlawfully possesses a firearm as a principal by showing actual possession or through constructive possession. *State v. Raleigh*, 157 Wn. App. 728, 737, 238 P.3d 1211 (2011). The State establishes actual possession when the defendant has physical custody of the firearm. *State v. Reichert*, 158 Wn. App. 374, 390, 242 P.3d 44 (2010). We agree with Joseph Shouse that the only evidence that he actually possessed a firearm during the raid at Gerald Moccardine's property comes from impeachment testimony elicited from Stephanie Van Comen. The purpose of impeachment is to attack the credibility of the witness and not to furnish substantive evidence of the crime. *State v. Jefferson*, 6 Wn. App. 678, 683, 495 P.2d 696 (1972). Thus, any guilt for principal liability must rest on constructive possession. The State agrees and declares it never sought to base guilt upon actual possession.

The State may establish constructive possession by showing the defendant had dominion and control over the firearm. *Reichert*, 158 Wn. App. at 390; *State v. Murphy*, 98 Wn. App. 42, 46, 988 P.2d 1018 (1999). Dominion and control means that the defendant can immediately convert the item to their actual possession. *State v. Jones*, 146 Wn.2d 328, 333, 45 P.3d 1062 (2002); *Reichert*, 158 Wn. App. at 390. This control need not be exclusive, but mere proximity to the firearm is insufficient to show dominion

20

and control. *State v. Embry*, 171 Wn. App. 714, 747; 287 P.3d 648 (2012); *State v. George*, 146 Wn. App. 906, 920, 193 P.3d 693 (2008); *State v. Chouinard*, 169 Wn. App. 895, 899, 282 P.3d 117 (2012). Knowledge of the presence of a firearm, without more, is insufficient to show dominion and control to establish constructive possession. *Chouinard*, 169 Wn. App. at 899; *State v. Hystad*, 36 Wn. App. 42, 49, 671 P.2d 793 (1983).

The State hinges Joseph Shouse's conviction for unlawful possession of a firearm on its theory that he was an accomplice to the acts of Engelstad and the other gunman. If Shouse was an accomplice, the State contends, he exercised dominion and control over the firearms and thereby constructively possessed them. We believe the State erroneously merges accomplice liability with constructive possession. Although the end result is the same, the two are separate concepts with different elements. If Shouse constructively possessed a firearm, he is guilty as a principal. If Shouse is guilty as an accomplice, it is because someone else that he assisted either actually or constructively possessed a firearm unlawfully. Under principal liability, Shouse must be disqualified from possessing a gun. Under accomplice liability, another person possessing a gun must be the one disqualified. Accomplice liability and constructive possession are independent pegs upon which a conviction for unlawful possession could stand.

We agree with Joseph Shouse that the jury lacked sufficient evidence to convict him of constructive possession of a firearm. In a case resembling this one, *State v.*

21

*Embry*, 171 Wn. App. 714, a jury convicted three defendants, two as accomplices, of attempted first degree murder and first degree unlawful possession of a firearm. On appeal, the two defendants charged as accomplices challenged their unlawful possession convictions for insufficient evidence, contending they neither actually nor constructively possessed the firearm. Another defendant, a member of the same gang, shot a rival gang member and then hopped in a car in which the other defendants were respectively driver and passenger. Although noting that one may constructively possess a firearm jointly with another person, the court reversed the two defendants' convictions for insufficient evidence. The court emphasized that: (1) authorities never recovered a gun; (2) no witness saw the defendants with the gun in their hands; (3) no witness testified they exercised control or dominion; (4) and although one could infer the defendants may have known the third defendant entered their car with a gun, their proximity was insufficient to prove constructive possession.

In the case on appeal, law enforcement never recovered a gun. No witness testified to seeing Joseph Shouse with a gun in his hands or that he exercised control or dominion over the guns Engelstad and another actually possessed. While Shouse arrived and left with Engelstad, his mere proximity to the weapon is insufficient to show he constructively possessed the firearm. The State contends that, since Shouse and Engelstad worked together toward regaining Shouse's possessions and because Shouse stole objects only after Engelstad and a third person pulled guns on the victims, Shouse

22

can be tagged with constructive possession. We find no case that supports such a conclusion. Such evidence is more directed to the theory of accomplice liability.

Neither party directly addresses whether one may be convicted for unlawful possession of a firearm under accomplice liability. No Washington decision directly addresses this question. *State v. Embry* only asked whether fellow gang members could be convicted of constructive possession. We hold that one can be guilty under accomplice liability. The accomplice liability statute, RCW 9A.08.020(3), lists the circumstances which render one an accomplice "of a crime." The statute does not exclude any crimes from accomplice liability. The jury instructions given by the court read awkwardly in the context of declaring one guilty of unlawful possession of a firearm by accomplice liability, but, read as a whole, the instructions allowed the jury to convict Joseph Shouse of unlawful possession through accomplice liability.

In a foreign decision, *Commonwealth v. Knox*, 50 A.3d 749 (Pa. Super. Ct. 2012), known for defendant twins switching seats at trial to confuse witnesses, the testimony showed that only one brother possessed a gun during the events leading to and after the murder. The appellate court agreed with the other brother that the evidence did not support a conviction for his unlawful possession of a firearm. The court, nonetheless, held that one can be guilty as an accomplice for unlawful possession. His being present at the scene when his brother pulled the gun and fleeing with his brother, among other evidence, was sufficient for accomplice liability. The Pennsylvania accomplice liability

23

statute is stricter than the Washington statute.

We already reviewed the rules of accomplice liability and the rules for determining sufficiency of evidence. For the same reasons that we concluded that Joseph Shouse could be convicted as an accomplice for other crimes, we hold there was sufficient evidence to convict Shouse of unlawful possession of a firearm. To prove that one present is an aider, it must be established that he is "ready to assist" in the commission of the crime. *Rotunno*, 95 Wn.2d at 933; *In re Wilson*, 91 Wn.2d 487, 491 (1979).

To repeat from earlier, Shouse was much more than merely present at Gerald Moccardine's property during the commission of the crimes. Reasonable inferences establish that he instigated and was the leader behind the crimes. He and his comrades searched for property allegedly his. Joseph Shouse and his colleagues came together, searched Moccardine's property together, held people captive together, took personal property of others together, and left together. Shouse and Engelstad went to the Moccardine trailer together, at which time Engelstad pulled his gun. There is no evidence that Shouse left the trailer before the pulling of the gun.

Our conclusion that sufficient evidence existed to convict Joseph Shouse on the basis of accomplice liability does not complete our analysis. The verdict does not disclose whether the jury convicted Shouse on the basis of accomplice liability or principal liability. If a jury may have found the defendant guilty either because of

principal or accomplice liability, there must be sufficient evidence to support both theories to avoid reversal. *State v. Collins*, 76 Wn. App. 496, 501, 886 P.2d 243 (1995); *State v. Amezola*, 49 Wn. App. 78, 90, 741 P.2d 1024 (1987). Therefore, we reverse the conviction of Joseph Shouse on the charge of unlawful possession of a firearm.

When one alternative means for committing the crime is not supported by sufficient evidence, the remedy is to remand for a new trial solely on the second alternative means for committing the crime. *State v. Maupin*, 63 Wn. App. 887, 894-95, 822 P.2d 355 (1992); *Amezola*, 49 Wn. App. at 90. Thus, we remand, for a new trial, the charge against Joseph Shouse for unlawful possession of a firearm on the ground of accomplice liability.

ISSUE 6:

Does sufficient evidence support the jury's finding that someone at the robbery was armed with a real gun, thus justifying the deadly weapon sentence enhancement?

ANSWER 6:

Yes.

Both Joseph Shouse and Gary Engelstad argue that the State failed to prove beyond a reasonable doubt that anyone was armed with a real gun. The two cling to testimony from Gerald Moccardine that he was unsure whether the object Engelstad pointed was a gun or an octagonal tool. The defendants also emphasize that the other alleged gun at the scene was pointed through a doorway at night, no witness provided a

25

description of the gun, and the State never recovered any gun. We hold that sufficient evidence supports the deadly weapon sentencing enhancement special verdict.

RCW 9.95.015 allows an enhanced sentence if the defendant or an accomplice is armed with a deadly weapon at the time of a crime. Evidence to prove the presence of a firearm in the commission of a crime is sufficient to uphold a jury's special verdict if a single witness testifies that during the commission of the crime a firearm was present, regardless of whether the firearm is located. *State v. Tongate*, 93 Wn.2d 751, 754, 613 P.2d 121 (1980). While Moccardine could not be sure whether Engelstad brandished a firearm, he was positive "the other guy had a gun, [he] knew it was a gun." RP at 311. Dawn Flood testified Engelstad pulled a gun and that "another guy came around the corner with a gun." RP at 198. Julie Curry also testified that Engelstad pulled a gun and, after she left the trailer, another "person standing at the doorway . . . was holding a gun on [Moccardine] and [Flood] to keep them" in place. RP at 422.

Joseph Shouse also contends the special verdict instruction did not comply with the law because it did not specify the jury must find the defendants were armed with a real gun. In *State v. Tongate*, the court imposed a deadly weapon enhancement after the jury returned a special verdict finding Tongate was armed with what appeared to be a firearm or other deadly weapon. The jury in Shouse and Engelstad's trial were instructed that they must find they were "armed with a firearm." Clerk's Papers (CP) at 144. The trial court also defined a "firearm" in instruction 13 as "a weapon or device from which a

26

projectile may be fired by an explosive such as gun powder." CP at 114. Only a real firearm fires a projectile using explosives. The jury instructions required the jury to find the presence of a deadly weapon. Therefore, they were sufficient.

ISSUE 7:

Whether the trial court's dismissal of two theft charges negated the essential elements of Shouse and Engelstad's robbery convictions?

ANSWER 7:

No.

The trial court dismissed the two theft charges after the jury returned a verdict. Joseph Shouse and Gary Engelstad ask this court to infer that the trial court dismissed these charges for insufficient evidence. They then argue that, if insufficient evidence supported the theft convictions, the evidence is also insufficient to support the robbery convictions predicated on theft. Thus, according to Shouse and Engelstad, we must dismiss the two, first degree robbery convictions.

Shouse and Engelstad's argument is based upon the false premise that the theft charges were dismissed because of insufficiency of evidence. Nevertheless, the trial court dismissed the theft convictions because they merged with the first degree robbery convictions for double jeopardy purposes. As analyzed above, the evidence supporting the convictions for first degree robbery is sufficient and should be affirmed.

27

ISSUE 8:

Did the prosecutor engage in misconduct that deprived Shouse of a fair trial?

ANSWER 8:

No.

Joseph Shouse argues that the State engaged in two acts of prosecutorial misconduct. First, it called witness Stephanie Van Comen, a witness that it knew would not give it useful evidence, so it could introduce impeachment evidence that the jury could use substantively to convict Shouse of unlawful possession of a firearm. Second, the State vouched for her testimony when it elicited testimony that she would testify truthfully.

The State may impeach a witness with prior out-of-court statements of material fact that are inconsistent with testimony in court, even if such statements would otherwise be inadmissible as hearsay. *State v. Clinkenbeard*, 130 Wn. App. 552, 569, 123 P.3d 872 (2005); *State v. Dickenson*, 48 Wn. App. 457, 466, 740 P.2d 312 (1987). Impeachment evidence affects the witness's credibility; it is not probative of the substantive facts. *Clinkenbeard*, 130 Wn. App. at 569; *State v. Johnson*, 40 Wn. App. 371, 377, 699 P.2d 221 (1985). Out of concern that a jury could struggle with distinguishing between impeachment and substantive evidence, courts have consistently held the State may not use such a statement under the guise of impeachment for the primary purpose of placing before the jury substantive evidence which is not otherwise admissible. *State v. Hancock*,

28

109 Wn.2d 760, 763, 748 P.2d 611 (1988); *State v. Lavaris*, 106 Wn.2d 340, 344, 721 P.2d 515 (1986); *Clinkenbeard*, 130 Wn. App. 569-70; *State v. Babich*, 68 Wn. App. 438, 444, 842 P.2d 1053 (1993).

When distinguishing between permissible impeachment testimony and impermissible testimony elicited under the guise of impeachment, courts ask whether the State called the witness for the primary purpose of impeaching her with otherwise inadmissible testimony. *Lavaris*, 106 Wn.2d at 345 (citing *United States v. DeLillo*, 620 F.2d 939, 946 (2d Cir. 1980)). Courts reason that the State's primary purpose was not to impeach a witness when the impeachment testimony corroborated elements essential to the State's case, when the testimony provided important circumstantial evidence of the events leading up to the case, and where nothing in the record indicates that there was reason to anticipate that the witness would not testify consistently with her earlier statements. *DeLillo*, 620 F.2d at 946; *Hancock*, 109 Wn.2d at 764; *Lavaris*, 106 Wn.2d at 346-47. Courts conclude that the State's primary purpose in calling a witness was to impeach that witness when the only testimony *establishing* an essential element of the State's case comes from the impeachment testimony and the State relies on the testimony in closing argument. *Clinkenbeard*, 130 Wn. App. 570-71.

Here the State did not offer Stephanie Van Comen's testimony with the primary purpose of impeaching her. Van Comen's testimony more closely resembles the type courts permitted in *Lavaris*, *Hancock*, and *DeLillo*. Van Comen, like the witness in

29

*Lavaris*, corroborated essential elements of the robbery, that Engelstad and others took a purple crown royal bag containing jewelry from Moccardine's lot. Like the witness in *DeLillo*, Van Comen testified to the circumstances leading up to the robbery, including the day, time, and location where it occurred, and the people there. *See generally* RP at 482-86. And like *Hancock*, nothing in the record indicates the State anticipated Van Comen would testify inconsistently with earlier statements. Police interviewed Van Comen on a couple of occasions. In her second interview, Van Comen recanted her previous statement that she observed Shouse with a shotgun. But in that and subsequent interviews she reaffirmed the other statements she made. The State only impeached her after it became clear her testimony was inconsistent with the prior statements she reaffirmed. More importantly, the State never used the impeachment testimony to argue that Shouse held a gun during the robbery.

Even if the State offered Stephanie Van Comen's testimony with the primary intent of impeaching her, Joseph Shouse must still establish prejudice. *Lavaris*, 106 Wn.2d at 344. Shouse fails to meet this burden. To show prejudice, Shouse would have to show the impeachment testimony the State elicited was that he possessed a shotgun. But that is not the testimony the State elicited. The State impeached Van Comen by showing police afforded her an opportunity to correct any misstatements. When they did, Van Comen stated she previously lied; she did not see Shouse with a shotgun. The State

30

relied on Van Comen's recantation to impeach her testimony at trial. Moreover, the State did not use the impeachment testimony to argue that Shouse was armed with a gun.

Shouse also claims the State improperly vouched for Van Comen. The State may not vouch for a witness because it is entirely for the jury to determine whether a witness testified truthfully. *United States v. Brooks*, 508 F.3d 1205, 1210 (9th Cir. 2007); *State v. Ish*, 170 Wn.2d 189, 196, 241 P.3d 389 (2010). In general, the State improperly vouches for a witness if (1) the prosecutor expresses his or her personal belief as to the veracity of the witness or (2) the prosecutor indicates that evidence not presented at trial supports the witness's testimony. *Brooks*, 508 F.3d at 1209; *Ish*, 170 Wn.2d at 196.

We agree that the State vouched for Stephanie Van Comen by eliciting the fact that she agreed to testify truthfully in exchange for their assistance in resolving a burglary charge. In *Ish*, our high Court held that where the credibility of the witness had not previously been attacked, referencing the witness's out-of-court promise to testify truthfully was irrelevant and had the potential to prejudice the defendant. 170 Wn.2d at 199. Van Comen's testimony had not previously been attacked. Thus, the reference to her out-of-court promise to testify truthfully was improper.

Once a defendant establishes that a prosecutor's statements are improper, this court determines whether the statement prejudiced the defendant. *State v. Emery*, 174 Wn.2d 741, 760, 278 P.3d 653 (2012). If the defendant did not object at trial, the defendant is deemed to have waived any error, unless the prosecutor's misconduct was so

flagrant and ill intentioned that an instruction could not have cured the resulting prejudice. Under this heightened standard, the defendant must show that (1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'

*Emery*, 174 Wn.2d at 760-61 (internal citation omitted) (quoting *State v. Thorgerson*, 172 Wn.2d 438, 455, 258 P.3d 43 (2011)). Shouse did not object at trial and thus must show no instruction would have cured the misconduct and the misconduct had a substantial likelihood of affecting the jury trial. Shouse alleges neither and can show neither. There is no reason a limiting instruction would not have cured any potential prejudice. Here, the judge instructed the jury that they are the "sole judges of the credibility of each witness." CP at 102. Juries are presumed to follow the trial court's instructions, absent evidence proving the contrary. *State v. Kirkman*, 159 Wn.2d 918, 928, 155 P.3d 125 (2007). Shouse also fails to allege or establish that the misconduct likely resulted in substantial prejudice, particularly when the State vouched for testimony that Shouse did not possess a shotgun.

ISSUE 9:

Did the prosecutor elicit improper testimony about Dawn Flood's veracity when questioning Corporal Nale?

ANSWER 9:

32

No.

Joseph Shouse and Gary Engelstad complain for the first time on appeal that the trial court did not instruct the jury to disregard the testimony that Flood was candid and open. Br. of Appellant at 36. Generally, appellate courts will not consider issues raised for the first time on appeal. RAP 2.5(a); *State v. Tolias*, 135 Wn.2d 133, 140, 954 P.2d 907 (1998). A claim may be raised, however, if it is a manifest error affecting a constitutional right. *Kirkman*, 159 Wn.2d at 934 (citing RAP 2.5(a)(3)). To do so, an appellant "must identify a constitutional error and show how the alleged error actually affected the defendant's rights at trial. It is this showing of actual prejudice that makes the error 'manifest,' allowing appellate review." *Kirkman*, 159 Wn.2d at 926-27; *State v. McFarland*, 127 Wn.2d 322, 333, 899 P.2d 1251 (1995).

Based upon the foregoing principles, we analyze alleged constitutional error raised for the first time on appeal by applying a four step process. First, we employ a cursory determination as to whether the alleged error in fact suggests a constitutional issue. Second, we determine whether the alleged error is manifest. Essential to this determination is a plausible showing by the defendant that the asserted error had practical and identifiable consequences in the trial of the case. Third, if the court finds the alleged error to be manifest, then the court must address the merits of the constitutional issue. Finally, if the court determines that an error of constitutional import was committed, then, and only then, the court undertakes a harmless error analysis. *State v. Barr*, 123 Wn.

33

App. 373, 380, 98 P.3d 518 (2004); *State v. Lynn*, 67 Wn. App. 339, 345, 835 P.2d 251 (1992).

Joseph Shouse and Gary Engelstad raise a constitutional issue. Joseph Shouse and Gary Engelstad argue that the jury may have improperly found them guilty based on Corporal Nale's opinion that Dawn Flood was candid and open. Nale testified that during his interview he found Flood candid and open. Later, the State asked Nale to explain any training he received for interviewing a witness. Nale explained he learned the Reid technique for interviewing before defense counsel requested a sidebar. After the sidebar, the prosecutor continued questioning Corporal Nale:

> Q. And as you're interviewing individuals, are you assessing their demeanor?
> A. Yes.
> Q. Is that a factor in your—because I believe you testified that you felt she was not being false with you that you had—
> [Englestad's Attorney]: Objection. That's exactly what we were talking about?
> THE COURT: I'll sustain the objection.
> [Prosecutor]: State has no further questions.

RP at 89.

We agree with Joseph Shouse and Gary Engelstad that the State committed constitutional error by commenting on the credibility of Dawn Flood. Improperly opining on a victim's credibility is an error of the constitutional right to a jury trial. *Kirkman*, 159 Wn.2d at 927. Corporal Nale characterized Flood as "open and candid." RP at 87. "Candid" means she is "free from bias, prejudice, or malice" and "marked by

34

honest sincere expression." WEBSTER'S THIRD INTERNATIONAL DICTIONARY 325 (1993).

Nale's characterization is an implicit, if not tacit, endorsement of Flood's believability.

We do not reverse, however, because we do not find prejudice.

"Manifest" in RAP 2.5(a)(3) requires a showing of actual prejudice. *State v.
Walsh*, 143 Wn.2d 1, 8, 17 P.3d 591 (2001); *Kirkman*, 159 Wn.2d at 935. "Actual

prejudice" requires Shouse and Engelstad show the error had "practical and identifiable

consequences in the trial." *Kirkman*, 159 Wn.2d at 935.

In considering whether defendants established prejudice in *Kirkman*, the court

noted that the "record in each case also establishe[d] that each jury received specific

instructions that they were the sole triers of fact and the sole deciders of the credibility of

witnesses." 159 Wn.2d at 937. Our trial court also instructed the jurors that they were

"the sole judges of the credibility of each witness . . . [and] the judges of the value or

weight to be given to the testimony of each witness." CP at 102. Jurors are presumed to

follow the court's instructions. *Kirkman*, 159 Wn.2d at 937. The court's curative

instructions, in addition the other testimony supporting their convictions, suggests neither

suffered prejudice. *Kirkman*, 159 Wn.2d at 938.

ISSUE 10:

Did the prosecutor unconstitutionally comment on Shouse's right to remain silent

in closing arguments?

ANSWER 10:

No.

During closing arguments, the prosecutor stated, "Now Mr. Shouse had the opportunity to provide us with the information as to what he claimed Mr. Moccardine took did he not?" RP at 646. Because of the context of the statement, we disagree with Joseph Shouse that the remark was an improper statement infringing on Shouse's right to remain silent.

The United States Constitution's Fifth Amendment, made applicable to the States by the Fourteenth Amendment, prohibits the States from forcing a defendant to testify at trial. *Griffin v. Cal.*, 380 U.S. 609, 612, 85 S. Ct. 1229, 14 L. Ed. 2d 106 (1965); *State v. Easter*, 130 Wn.2d 228, 238, 922 P.2d 1285 (1996). To protect this privilege, the State is also prohibited from eliciting comments from witnesses or commenting during closing argument on a defendant's silence, if such comments may lead a jury to infer guilt. *Easter*, 130 Wn.2d at 236. Even allusion to the defendant's failure to testify violates his constitutional privilege against compulsory self-incrimination, since it cuts down on the privilege by making its assertion costly. 13 ROYCE A. FERGUSON WASHINGTON PRACTICE SERIES: CRIMINAL LAW § 4504 (3d ed. 2004) (citing *State v. Wilmoth*, 31 Wn. App. 820, 644 P.2d 1211 (1982)). In Washington, a defendant's constitutional right to silence applies in both pre and post arrest situations. *State v. Romero*, 113 Wn. App. 779, 786-87, 54 P.3d 1255 (2002); *Easter*, 130 Wn.2d at 243.

36

During the closing arguments of this case the prosecutor began by asking who the victim was. "Is the victim Gerald Moccardine? Is the victim Dawn Flood? Is the victim Julie Curry?" RP at 642. The State asked this question because counsel for Shouse and Engelstad suggested that the defendants were the victims of a crime. The State sought to make the point that there was no evidence of Gerald Moccardine taking property of Joseph Shouse. So, the prosecutor rhetorically asked, "Now Mr. Shouse had the opportunity to provide us with the information as to what he claimed Mr. Moccardine took did he not?" RP at 646. The State spoke further that Shouse had the opportunity to provide a list of items taken from him when Shouse spoke with Officer Baird three days after the armed robbery.

We hold the prosecutor's comments did not implicate Joseph Shouse's Fifth Amendment right. If a defendant voluntarily offers information to police, "his toying with authorities by allegedly telling only part of his story" is not protected by *Miranda*. *State v. Young*, 89 Wn.2d 613, 621, 574 P.2d 1171 (1978). Shouse told Baird he suspected Moccardine of stealing items from him, but refused to explain why he suspected Moccardine or what items were stolen. Because Shouse did not remain silent entirely, the State could comment on what Shouse did not say. *State v. Pottorf*, 138 Wn. App. 343, 348, 156 P.3d 955 (2007).

Assuming we concluded that the State's closing remarks implicated the constitutional right to remain silent, we still would not reverse. The comment only

37

indirectly commented on Joseph Shouse's silence and he shows no prejudice.

Under an analysis created in *Romero*, we first question whether the prosecutor's comment is a direct or indirect comment on the defendant's right to silence. *Romero*, 113 Wn. App. at 790. On the one hand, a witness or state agent makes a direct comment when he or she explicitly references that a defendant invoked his or her right to remain silent. *Pottorff*, 138 Wn. App. at 346; *Romero*, 113 Wn. App. at 793. For example, in *Romero*, this court found a police officer made a direct comment about the defendant's right to remain silent when the officer testified, "I read him his *Miranda* warnings, which he chose not to waive, would not talk to me." *Romero*, 113 Wn. App. at 793. In another instance, the court found an officer made a direct comment when the officer testified he read the defendant his *Miranda* rights and the defendant refused to talk. *State v. Curtis*, 110 Wn. App. 6, 9, 37 P.3d 1274 (2002). On the other hand, a witness or a state agent makes an indirect comment on the right to remain silent when a jury could infer from the comment the defendant attempted to exercise his right to remain silent. *Pottorff*, 138 Wn. App. at 347. For example, courts ruled that a police officer made an indirect comment when the officer testified the defendant claimed he was innocent and agreed to take a polygraph, but only after discussing the matter with his attorney. *State v. Lewis*, 130 Wn.2d 700, 706, 927 P.2d 235 (1996); *State v. Sweet*, 138 Wn.2d 466, 480, 980 P.2d 1223 (1999). The courts concluded that the witnesses' testimony was a mere reference to silence, not a "comment" on the silence, and thus not reversible error absent a showing of

prejudice. *Sweet*, 138 Wn.2d at 481 (citing *State v. Lewis*, 130 Wn.2d 700, 706-07, 927 P.2d 235 (1996)).

The State, in our trial, uttered a "mere reference" to Shouse's silence. Unlike the comments by officers in *Romero* and *Curtis*, the prosecutor did not explicitly reference Shouse's right to remain silent, nor did the State even reference Shouse's refusal to answer Baird's questions. He spoke of Shouse's opportunity to and failure to tell Baird what items were stolen from him when he complained about stolen objects.

Shouse cannot show the State's comments prejudiced him. To show prejudice, Shouse must demonstrate that the comments on his silence were used as substantive evidence of his guilt. *State v. Burke*, 163 Wn.2d 204, 215, 181 P.3d 1 (2008). The prosecution's comments were not used as substantive evidence of Shouse's guilt. Whether Shouse disclosed to police why he suspected Moccardine of stealing from him or what items may have been taken is irrelevant to whether Shouse aided Engelstad and others to rob Moccardine and Flood, and assault Moccardine, Flood, and Curry.

The defendant bears the burden of demonstrating that the prosecutor's remarks were improper. *State v. Gregory*, 158 Wn.2d 759, 841, 147 P.3d 1201 (2006); *State v. Stenson*, 132 Wn.2d 668, 718, 940 P.2d 1239 (1997). Joseph Shouse has not met his burden.

39

ISSUE 11:

Did the prosecutor engage in misconduct by interjecting facts not in evidence in his closing argument?

ANSWER 11:

No.

Joseph Shouse and Gary Engelstad argue that, in his closing argument, the prosecutor interjected facts not in evidence. Specifically, the prosecutor said Shouse "showed up at the trailer, knows the gun's there. Steps forward and says, 'Hey, they are going to take care of this and I am going to go get the property.'" RP at 662-63. Later the prosecutor commented, in response to defendant's emphasizing the lack of weapons found, that the people that bring the weapons take the weapons with them. "Does that mean weapons weren't there? No." RP at 664.

We question whether Shouse and Engelstad preserved this argument for appeal. Shouse objected when the prosecutor stated Shouse constructively possessed the weapon Englestad actually possessed. But no counsel later objected to the State's statement that suspects often bring weapons to a crime and depart with them.

We conclude the prosecution did not engage in misconduct anyway. The defendant bears the burden of demonstrating whether the prosecutor's remarks were improper. *Gregory*, 158 Wn.2d 759 at 841; *Stenson*, 132 Wn.2d 668 at 718. Allegedly improper comments must be viewed in the context of the entire argument, and a

prosecutor enjoys wide latitude in drawing and expressing reasonable inferences from the evidence. *Gregory*, 158 Wn.2d at 841; *State v. Gentry*, 125 Wn.2d 570, 641, 888 P.2d 1105 (1995). Even if the defendant shows the comments were improper, the error does not require reversal unless the appellate court determines there is a substantial likelihood the misconduct affected the jury's verdict. *Gregory*, 158 Wn.2d at 841; *Gentry*, 125 Wn.2d at 641. A prosecutor commits reversible misconduct by urging the jury to decide a case based on evidence outside the record. *State v. Pierce*, 169 Wn. App. 533, 553, 280 P.3d 1158 (2012); *State v. Claflin*, 38 Wn. App. 847, 851, 690 P.2d 1186 (1984).

We address first the prosecution's reference to the thoughts of Joseph Shouse when arriving at the crime scene. In the past, courts found a prosecutor argued facts outside the record when a prosecutor spoke in the first person as he described the defendant's thought process before the crime. *Pierce*, 169 Wn. App. at 553-54. The court found the prosecutor's statement amounted to arguing facts outside the evidence because it attributed "repugnant and amoral thoughts to [the defendant]—thoughts that were based on the prosecutor's speculation and not the evidence." *Pierce*, 169 Wn. App. at 554. But unlike *Pierce*, the prosecutor below did not attribute repugnant and amoral thoughts to Shouse, nor did he speculate about the motive of the crime. The prosecutor described why Shouse may have aided Engelstad based on the testimony provided by witnesses.

41

Stephanie Van Comen testified the group went to Moccardine's trailer "to pick up some stuff [Moccardine] had taken from [Shouse]." RP at 478. Van Comen's testimony supports the prosecutor's statements about why Shouse went to Moccardine's property that night.

Even if the prosecutor's statements were improper, Shouse and Engelstad fail to assert, let alone establish, prejudice. The defendant bears this burden. *Gregory*, 158 Wn.2d at 841.

We next address the prosecutor's comment that suspects who bring weapons to crimes depart with them. This statement is based upon testimony in the record. The prosecutor asked Detective Vraves, "In those several cases [investigating crimes involving firearms], how often have you found firearms that were used in the commission of a crime left behind?" RP at 64. Detective Vraves answers, "most of the time the weapon goes with the subject." RP at 64. The prosecutor did not improperly interject facts not in evidence.

ISSUE 12:

Did cumulative errors deny Shouse a constitutionally fair trial?

ANSWER 12:

No.

Joseph Shouse argues that prosecutorial misconduct, combined with minimal evidence introduced at trial showing his actual involvement in the crimes, amounts to

42

cumulative error and deprived him of a fair trial under the Sixth and Fourteenth

Amendments to the United States Constitution. We disagree. We find there to be strong

evidence of guilt and only one harmless error.

ISSUE 13:

Should Engelstad's and Shouse's convictions for second degree assault merge

with their convictions for first degree robbery?

ANSWER 13:

Yes.

SHOUSE CONTENDS

Joseph Shouse and Gary Engelstad maintain that their respective convictions for

second degree assault merge with first degree robbery convictions. Therefore, they argue

that their convictions for assault impose double jeopardy upon them. We agree that

merger applies and reverse the assault convictions.

Although Shouse and Engelstad mention the constitutional right prohibiting

double jeopardy, we base our decision upon the merger doctrine and apply no double

jeopardy scrutiny. Merger and double jeopardy are related concepts and a double

jeopardy analysis may include a merger analysis. *State v. Freeman*, 153 Wn.2d 765, 772-

73, 108 P.3d 753 (2005). Nevertheless, the concepts are distinct. The merger of crimes

is not necessarily of constitutional origin. *State v. Frohs*, 83 Wn. App. 803, 811 n.2, 924

P.2d 384 (1996). Instead, the doctrine of merger is based upon the assumption that the

legislature did not intend to punish two crimes, when one crime is a predicate to a second crime. The merger doctrine is a common law or case law rule of statutory interpretation. *State v. Vladovic*, 99 Wn.2d 413, 420-21, 662 P.2d 853 (1983); *Frohs*, 83 Wn. App. at 809.

The State may bring multiple charges arising from the same criminal conduct in a single proceeding. *State v. Michielli*, 132 Wn.2d 229, 238-39, 937 P.2d 587 (1997). Nevertheless, the merger doctrine may require the dismissal of one charge after trial. *Freeman*, 153 Wn.2d at 772-73. Merger occurs when the legislature clearly indicated that, in order to prove a particular degree of crime, the State must prove not only that a defendant committed that crime but that the crime was accompanied by an act that is defined as a crime elsewhere in the criminal statutes. *State v. Deryke*, 110 Wn. App. 815, 822-23, 41 P.3d 1225 (2002), *aff'd*, 149 Wn.2d 906, 73 P.3d 1000 (2003). Merger is appropriate, however, only when the degree of one offense is raised by conduct separately criminalized by the legislature. The court presumes the legislature intended to punish both offenses through a greater sentence for the greater crime. *Freeman*, 153 Wn.2d at 772-73; *State v. Chesnokov*, 175 Wn. App. 345, 349, 305 P.3d 1103 (2013); *State v. Parmalee*, 108 Wn. App. 702, 710, 32 P.3d 1029 (2001). For instance, the doctrine applies when, to prove first degree rape, the State must prove not only that a defendant committed rape, but also that the rape was accompanied by an act defined as a

44

crime elsewhere in the criminal statutes, such as assault or kidnapping. *Vladovic*, 99 Wn.2d at 420-21.

A person is guilty of robbery in the first degree if, during the commission of a robbery, he is armed with a deadly weapon, displays what appears to be a firearm or other deadly weapon, or inflicts bodily injury. RCW 9A.56.200. Robbery in the second degree is any other robbery. RCW 9A.56.210. Assault in the second degree includes an assault with a deadly weapon. RCW 9A.36.021(1)(c). Therefore, when the State charges an accused with robbery in the first degree for being armed with or use of a deadly weapon, the degree of the robbery is increased as a result of a second degree assault. In four decisions, Washington courts have held that the legislature did not intend to punish first degree robbery separately from second degree assault, at least when the assault facilitates the robbery. *In re Pers. Restraint of Francis*, 170 Wn.2d 517, 242 P.3d 866 (2010); *State v. Kier*, 164 Wn.2d 798, 194 P.3d 212 (2008); *Freeman*, 153 Wn.2d 765 (2005); *State v. Chesnokov*, 175 Wn. App. 345 (2013). "Under the merger rule, assault committed in furtherance of a robbery merges with robbery and without contrary legislative intent or application of an exception." *Freeman*, 153 Wn.2d at 778.

*State v. Freeman* analyzed the assault and robbery statutes. Our Supreme Court noted that "to prove first degree robbery as charged and proved by the State, the State had to prove the defendants committed an assault in furtherance of the robbery." *Freeman*, 153 Wn.2d at 778. "[W]ithout the conduct amounting to assault, each would be guilty of

45

only second degree robbery." *Freeman,* 153 Wn.2d at 778. "Under the merger rule, assault committed in furtherance of a robbery merges with robbery" unless an exception applies or there is other evidence of contrary legislative intent. *Freeman,* 153 Wn.2d at 778.

In *Freeman,* the high court found no exception applied and merged the defendant's first degree robbery and second degree assault convictions. In *Francis,* the court vacated a conviction for second degree assault, since it was the predicate crime used to raise robbery from second degree to first degree. In *State v. Chesnokov,* 175 Wn. App. 345 (2013), we merged one second degree assault conviction into the first degree robbery conviction, but left standing two assault convictions. Chesnokov pointed his gun at three victims, during the robbery. Only one assault was needed to raise the robbery conviction from second degree to first degree.

Despite the strong language in *State v. Freeman,* there is no per se rule that assault in the second degree merges into robbery in the first degree. 153 Wn.2d at 774. Rather, a case by case approach is required. 153 Wn.2d at 774. Even if two convictions would appear to merge on an abstract level under this analysis, they may be punished separately if the defendant's particular conduct demonstrates an independent purpose or effect of each. *Kier,* 164 Wn.2d at 804. We find no independent purpose in Shouse and Engelstad's crimes. The crimes were committed to the end of taking property from Gerald Moccardine's land.

46

The State contends Shouse's and Engelstad's case can be distinguished from *Freeman*. In *Freeman*, the defendants argued and the court found the first degree robbery conviction merged with the second degree assault conviction because the defendant assaulted the victims in furtherance of the robbery. 153 Wn.2d at 779. Without the assault conviction, the State could only have proved second degree robbery—not first degree. But unlike *Freeman*, according to the State, Shouse and Engelstad's convictions for first degree robbery are predicated on facts distinct from those forming the basis of their second degree assault convictions.

In the context of the events of October 19, the State alleges Shouse and Engelstad assaulted Moccardine, Flood, and Curry inside Moccardine's trailer when Engelstad and a second gunman pointed their weapons at the three. Afterwards, Engelstad, Shouse, and others robbed Moccardine and Flood as the second man who brandished a weapon held them inside the trailer. We agree that the acts may be legally and factually distinct, but that does not end our inquiry. We also agree with the State that our facts may be distinguished from *Freeman*, but our facts cannot be distinguished from the later decision. *Kier*, 164 Wn.2d 798 (2008). *State v. Kier* provides the controlling ruling because each case has more than one assault victim, but we do not know which assault the jury used to convict the defendants of first degree robbery.

In *State v. Kier*, Qualagine Hudson drove his Cadillac with his cousin, Carlos Ellison, as a passenger. The car exhibited a "For Sale" sign. The operator of another car

47

honked its horn, and Hudson, believing someone might be interested in buying the

Cadillac, stopped his car. Hudson exited his car and Herbert Kier exited the other car.

Kier pointed a gun at Hudson and Hudson fled the scene. Kier then approached the

passenger side of the Cadillac, displayed his gun, and ordered Ellison from the car. Kier

and his accomplices then drove off in the Cadillac. After Kier was convicted of both

second degree assault and first degree robbery, the State argued against merger on the

ground that only Hudson owned the Cadillac and the State only based the assault charge

on the pulling of the gun on Ellison. The court rejected the argument because the

evidence and instructions allowed the jury to consider either assault of Ellison or Hudson

as the basis for elevating the robbery. The rule of lenity required the merger of Kier's

second degree assault conviction into his first degree robbery conviction.

Here, the evidence and instructions afforded the jury the same opportunity to

consider alternative acts constituting assault as the basis for elevating the robberies to

first degree. The jury could have considered the victim of the assault and the victim of

the robbery to be the same.

Both the robbery and the assault convictions could be predicated upon the same

assault. For example, both crimes could be rooted on the second gunman's actions:

sweeping the room with his gun and then standing guard as others took Moccardine and

Flood's property. In the alternative, the jury could have chosen to elevate the robbery to

48

first degree on the basis of the bodily injury Engelstad inflicted on Moccardine before taking $15 from his wallet.

The usual remedy for violations of the prohibition of double jeopardy is to vacate the lesser offense. *State v. Hughes*, 166 Wn.2d 675, 686 n.13, 212 P.3d 558 (2009). Thus, we vacate the convictions of Joseph Shouse and Gary Engelstad for second degree assault.

ISSUE 14:

Whether Gary Engelstad's counsel was ineffective because he "discussed different things for his case," and because his counsel rested after the prosecution did.

ANSWER 14:

No.

We now begin our discussion of Gary Engelstad and Joseph Shouse's statements of additional grounds. Engelstad first argues that his lawyer provided ineffective assistance. To establish ineffective assistance of counsel a defendant must satisfy a two-part test (1) his or her counsel's assistance was objectively unreasonable and (2) as a result of counsel's deficient assistance, he or she suffered prejudice. *Strickland v. Washington*, 466 U.S. 668, 688, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). This court presumes counsel was effective. *State v. Gomez-Cervante*, 169 Wn. App. 428, 434, 282 P.3d 98 (2012).

49

Engelstad makes no argument overcoming the presumption of effectiveness. His claim that his counsel and he discussed different things is vague. Construing his claim in the light favorable to him he alleges his counsel presented a defense that they did not discuss, but he offers no evidence supporting this contention.

Engelstad may take issue with his counsel's choice not to present witnesses at trial. Yet, Engelstad fails to identify any witness his counsel should have called to testify. This court presumes the choice not to call witnesses is a legitimate trial strategy or tactic. *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011).

ISSUE 15:

Did the prosecutor engage in misconduct when he questioned Stephanie Van Comen about her pending burglary charges because that impeached her credibility and made Shouse look guilty, since he was a codefendant in her case as well?

ANSWER 15:

No.

As analyzed earlier, the State may impeach its own witness. Anyway, Engelstad's contention is unsupported in the record. The prosecutor never mentioned Shouse was a codefendant in Van Comen's burglary charge.

ISSUE 16:

Whether the trial court denied Gary Engelstad a fair trial by refusing to sever his trial from Shouse's trial?

50

ANSWER 16:

No.

In general, the granting or denial of a motion for separate trial of jointly charged defendants is entrusted to the sound discretion of the trial court and will not be disturbed on appeal absent a manifest abuse of discretion. *State v. Herd*, 14 Wn. App. 959, 961, 546 P.2d 1222 (1976); *State v. Ferguson*, 3 Wn. App. 898, 479 P.2d 114 (1970). Defendant bears the burden of demonstrating specifically how a joint trial prejudiced his defense. *State v. McDonald*, 40 Wn. App. 743, 700 P.2d 327 (1985). Engelstad does not allege any specific prejudice, let alone one that would show the trial court abused its discretion.

ISSUE 17:

Whether Gary Engelstad received an unfair trial because a woman slandered both Shouse and him by name in the hallway when the jury took a bathroom break?

ANSWER 17:

No.

Defense counsel alerted the trial court that a victim in another prosecution against Joseph Shouse talked in the hallway with a prosecutor. Defense counsel asked the two to speak inside the prosecutor's office, but the woman continued talking in the hall. The record does not show, however, that the woman spoke to any jurors or that any jurors overheard her comments.

51

ISSUE 18:

Whether Gary Engelstad Fifth Amendment right to remain silent was violated because the trial court failed to instruct the jury that it could not draw any adverse inferences from his decision not to testify?

ANSWER 18:

No.

Engelstad's claimed error is contrary to the trial record. The trial court instructed the jury, "The defendant is not required to testify. You may not use the fact that the defendant has not testified to infer guilt or to prejudice him in any way." CP at 108.

ISSUE 19:

Whether the prosecutor violated rights of Gary Engelstad, under 18 U.S.C. § 201(c)(2), by dropping a charge against Gerald Moccardine for possession in exchange for his testimony.

ANSWER 19:

No.

Gary Engelstad presents no evidence that the prosecution dropped charges against Moccardine in exchange for his testimony. If it had, counsel likely would have cross-examined him on the issue as he did Van Comen. In any case, 18 U.S.C. § 201 is an anti-bribery statute that proscribes giving something of value as a bribe for false testimony. *United States v. Moody*, 977 F.2d 1420, 1425 (11th Cir. 1992). Engelstad does not

contend any of Moccardine's testimony is false. Thus, the statute is inapplicable and its application is unsupported by the record.

ISSUE 20:

Whether Joseph Shouse's rights were violated by the trial court's instruction to the jury that he was previously convicted of a serious felony was prejudicial?

ANSWER 20:

No.

The jury instruction mentioning Joseph Shouse's prior conviction was relevant because of the charges of unlawful possession of a firearm. Joseph Shouse acknowledges that he stipulated to the jury instruction. As such, he is barred from raising this issue on appeal under the invited error doctrine. The doctrine of invited error "prohibits a party from setting up an error at trial and then complaining of it on appeal." *State v. Pam,* 101 Wn.2d 507, 511, 680 P.2d 762 (1984), *overruled on other grounds by State v. Olson,* 126 Wn.2d 315, 893 P.2d 629 (1995).

Shouse attempts to evade the stipulation by asserting he did not understand the effect of the stipulation. But the court specifically asked him if he understood. The court asked, "Mr. Shouse, Mr. Engelstad, do you know what we are talking about here?" RP at 456. Shouse responded, "Yes, sir." RP at 456. The court explained, "I need to get it out of your mouths not your attorney's." RP at 455. "I am trying to figure out whether you'll relieve the state of its burden of proof. The fact that you have been convicted of a

serious offense." RP at 457. Shouse responded, "I'll relieve." RP at 457. The court

followed up, "You relieve them of that burden?" RP at 458. Shouse, "Yes, sir." RP at

458. The record shows he knowingly and voluntarily stipulated to the jury instruction.

ISSUE 21:

Whether Joseph Shouse's counsel was ineffective for failing to explain the

prejudicial effect stipulating to a serious offense would have on his trial?

ANSWER 21:

No.

Even assuming Shouse's counsel did not explain the effect of stipulating to a

serious offense, the court adequately explained the effect to him. Therefore, he suffered

no prejudice and fails to establish ineffective assistance. *Strickland*, 466 U.S. at 690.

ISSUE 22:

Whether Joseph Shouse's counsel provided ineffective assistance when he failed

to challenge the State's evidence that was destroyed prior to the trial?

ANSWER 22:

No.

The record lacks any suggestion that the State destroyed or lost any evidence prior

to trial.

ISSUE 23:

Whether the State failed to prove the mens rea and actus reas elements for the trespass element of burglary against Joseph Shouse, since Moccardine previously invited him onto his property?

ANSWER 23:

No.

Next, Shouse contends the State failed to prove burglary since Moccardine previously invited him onto his property. A person commits the crime of burglary in the first degree when he or she enters or remains unlawfully in a building with intent to commit a crime against a person or property therein. RCW 9A.52.020. A person enters or remains unlawfully in or upon premises when he or she is not then licensed, invited, or otherwise privileged to so enter or remain. RCW 9A.52.010(5). While Moccardine invited Shouse onto his property in the past, sufficient evidence supports the jury's finding he remained on that property unlawfully when he and his cohorts threatened to steal alternators, struck Moccardine, and pointed guns at him.

ISSUE 24:

Whether Joseph Shouse's counsel provided ineffective assistance when he failed to object to hearsay testimony?

ANSWER 24:

No.

To establish ineffective assistance of counsel a defendant must satisfy a two-part test (1) that his or her counsel's assistance was objectively unreasonable and (2) that as a result of counsel's deficient assistance, he or she suffered prejudice. *Strickland*, 466 U.S. at 690.

The record substantiates Shouse's claim that the State introduced hearsay evidence, to which his counsel failed to object. Specifically, the State introduced a photographic lineup Deputy Sheriff Nathan Foster showed Moccardine. Foster testified Moccardine signed the lineup and identified Shouse. During a break in trial, the court admonished defense counsel for not objecting. The court then concluded, "it will be admitted at some point if not, we'll redress it later." RP at 136. Later the State showed the lineup to Moccardine to authenticate his signature identifying Joseph Shouse. Therefore, any deficiency in the performance of Shouse's counsel did not result in prejudice.

ISSUE 25:

Whether cumulative errors denied Joseph Shouse a fair trial?

ANSWER 25:

No.

Joseph Shouse only established his counsel's failure to object to hearsay introducing a lineup in which Moccardine identified him. Finding no others to accumulate, he fails to establish that he was denied a fair trial.

56

CONCLUSION

We vacate Joseph Shouse's conviction for unlawful possession of a firearm and merge Shouse's and Gary Engelstad's convictions for second degree assault with their convictions for first degree robbery. We remand for a new trial of Joseph Shouse's charge of unlawful possession of a firearm. We also remand for resentencing of both defendants. Otherwise, we affirm the convictions below.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Siddoway, C.J.

_____
Rawson J.P.T.

57